**FILED**

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NOV 2 8 2023

MITCHELL R. ELFERS
CLERK

MICHAEL JACOBS and
RUBY HANDLER JACOBS

       Plaintiffs,

vs.

Case. no. _____ 23cv1060 KK

BRANDON DEWAYNE CLARK a/k/a BRANDON
P. CLARK; MELLISSA MICHELLE CARROLL
a/k/a MELISSA M. ZAWISTOSKI; AMANDA
CARROLL a/k/a AMANDA CAROLE; WILLIAM
MICHAEL JONES; GENIENNE CONAWAY
RIGGLE; CANDIE RENEE SWAN; ASHTON
SWAN; RENEE ANDREA KEXEL; JEREMY R.
STONE; GERALD R. STONE; RUTH A. CHIODA
a/k/a RUTH HELDRETH;π and DOES 1 THROUGH
20; INDIVIDUALLY OR JOINTLY and
SEVERALLY.

       Defendants.

---

**COMPLAINT FOR BREACH OF CONTRACT, CIVIL LARCENY,
CONVERSION, TRESPASS, CONSPIRACY INVASION OF PRIVACY,
THEFT OF FIREARMS, CRUELTY TO ANIMALS,
WITH DEMAND FOR JURY TRIAL**

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

    **COMES NOW**, *pro se*[1] Plaintiffs Michael Jacobs and Ruby Handler Jacobs ("Plaintiffs"

or the "Jacobses"), filing this Complaint (the "Complaint") against Brandon Dewayne Clark

a/k/a Brandon P. Clark ("Clark"); Mellissa Michelle Carroll a/k/a Melissa Michelle Zawistoski

("Carroll"); Amanda Carroll a/k/a Amanda Carole ("A.Carroll"), William Michael Jones a/k/a

---

[1] The Supreme Court found that *pro se* pleadings should be held to "less stringent standards" than those
drafted by attorneys. *Haines v. Kerner*, 404 U.S. 520 (1971), *Puckett v. Cox*, 456 F. 2d 233 (1972) (6th
Cir. USCA).

1

William M. Neely ("Jones"); Genienne Conaway a/k/a Genienne Conaway Riggle ("Conaway");

Candie Renee Swan ("Swan"); Ashton Swan ("A. Swan"); Renee Andrea Kexel a/k/a Renee

Andrea Montoya ("Kexel"); Jeremy R. Stone ("J.Stone"); Gerald R. Stone ("G.Stone"); Ruth A.

Chioda a/k/a Ruth A. Heldreth ("Chioda") and Does 1 through 20 ("Does").

Plaintiffs refer hereinafter to Defendants A.Carroll, Jones, Conaway, Swan, A. Swan,

Kexel, J.Stone, G.Stone, and Chioda collectively as "Accomplice Defendants."

Plaintiffs allege as follows:

## I.   **JURISDICTION**

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332 and

1367.

2.     This Court has federal question jurisdiction over this claim because Defendants

Clark and Carroll violated 18 U.S.C. § 922(i) by stealing Plaintiff Handler Jacobs' firearms and

transporting them between four States.

3.     This Court has federal question jurisdiction under 18 U.S. Code § 1344(1) and (2)

due to Defendant Carroll knowingly executing, and attempts to execute, a scheme or artifice

to defraud a financial institution.

4.     This Court has federal question jurisdiction under 18 U.S.C. § 1001(a)(2) Carroll

knowingly and willfully made materially false, fictitious, or fraudulent statement or

representation to a New York Federal Court.

5.     This Court has federal question jurisdiction under 18 U.S.C. § 701 with Clark and

Carroll having stolen Plaintiff Handler Jacobs' U.S. Marshal Service badge ("USMS badge").

6.     This Court has federal question jurisdiction under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State and the amount at stake is more than $75,000, is a diversity of citizenship case.

7.     This Court has Ancillary jurisdiction under 28 U.S.C. §1367(a) which allows a federal court to hear a claim that would normally be outside of its subject-matter jurisdiction if it is substantially related to a claim that is within the court's jurisdiction.  A claim comes within a federal court's ancillary jurisdiction when it bears a logical relationship to the aggregate core of operative facts of the main claim.   Ancillary jurisdiction has been replaced entirely by supplemental jurisdiction, per 28 U.S.C. § 1367(b), part of the U.S. supplemental jurisdiction statute.

**II.     VENUE**

8.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), in that the Plaintiffs reside in this District.  Further, Defendants transact business in, and their conduct as averred in this Complaint, occurred in this District and the State of New Mexico.

**III.     THE PARTIES TO THIS COMPLAINT**

**The Plaintiffs**

9.     Plaintiff Michael Jacobs ("Plaintiff Jacobs") is a private adult resident of Albuquerque, Bernalillo County, and a citizen of New Mexico. Plaintiff Jacobs has been an international professional photojournalist for 54 years and an award winning director.

10.    Plaintiff Ruby Handler Jacobs ("Plaintiff Handler Jacobs") is a private adult resident of Albuquerque, Bernalillo County, and a citizen of New Mexico. She is a former U.S. Marshal Contracted Deputy, actor, award winning producer, musician and business owner.

11.   Plaintiffs are owners of and reside at 800 Calle Divina NE, Albuquerque, NM 87113 (the "Property").

## The Defendants

12.   Plaintiffs are informed and therefore believes that DEFENDANT CLARK is an adult who resides in Fort Mohave, Arizona.

13.   Plaintiffs are informed and therefore believe that DEFENDANT CARROLL is an adult who resides in Ft. Mohave, Arizona and/or Bullhead City, Arizona.

14.   Plaintiffs are informed and therefore believe that DEFENDANT A.CARROLL is an adult who resides in Albuquerque, New Mexico.

15.   Plaintiffs are informed and therefore believe that DEFENDANT JONES is an adult who resides in Albuquerque, New Mexico.

16.   Plaintiffs are informed and therefore believe that DEFENDANT CONAWAY is an adult who resides in Portales, New Mexico.

17.   Plaintiffs are informed and therefore believe that DEFENDANT SWAN is an adult who resides in Artesia, New Mexico.

18.   Plaintiffs are informed and therefore believe that DEFENDANT A.SWAN is an adult resident of Artesia, New Mexico.

19.   Plaintiffs are informed and therefore believe that DEFENDANT KEXEL is an adult who resides in Albuquerque, New Mexico.

20.   Plaintiffs are informed and therefore believe that DEFENDANT J.STONE is an adult who resides in Albuquerque, New Mexico.

21.   Plaintiffs are informed and therefore believe that DEFENDANT G.STONE is an adult who resides in Rio Rancho, New Mexico.

22.     Plaintiffs are informed and therefore believe that DEFENDANT CHIODA is an adult who resides in Bullhead City, Arizona.

23.     Plaintiffs are uninformed of the true names and capacities of defendants sued herein as DOES 1 through 20 inclusive, and therefore sues these defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities if and when ascertained.

24.     Hereinafter the parties referenced above shall be collectively referred to as "Defendants."

IV.     **FACTUAL BACKGROUND**

25.     Clark had previously been a security officer, on occasion, for Plaintiff Handler Jacobs' former New Mexico State licensed Private Patrol Operator company *No Stone Unturned Security & Investigative Services* ("NSU") in Albuquerque.  He had originally been recommended by Mavis Price of licensed Gallup Security as to his trustworthiness and returned to Tucson, Arizona following his assignment for NSU.  After becoming homeless by losing his trailer in Tucson, in or about July 2013 Clark returned to live with his "sister" in Albuquerque and kept in touch with Plaintiffs. Clark was not readily employable as a security officer because he neither had transportation[2] nor a valid driver's license.  A short time later Clark informed Plaintiffs that the lodging he had was to be sold and he would again be homeless.  In discussions with Clark, it was agreed that he would be the Jacobs' House Sitter for the upcoming trip Plaintiffs were making to visit their grandchildren in Boston, MA and the Plaintiffs agreed upon conditions that were required of him as a house sitter.  On October 3, 2013, Clark signed a five-year *Non-Disclosure, Non-Circumvention and Confidentiality Agreement* ("NDNCA") with the

---

[2] Clark informed the Jacobses that his car had been repossessed.

Jacobses as a House Sitter at their property (*See* Exh. 1), primarily to collect mail, water plants and feed pets (which they later murdered), and a place to live that was not in exchange for doing anything with the security company.

26.    The agreement also provided for security of "Confidential Information" as the Jacobses were developing an entertainment project ("Northern Corridor") and Clark would be privy to sensitive information held in the residence. Plaintiffs provided one upstairs bedroom and separate bathroom for his quarters.  Clark was forbidden from having anyone else in the home. While Plaintiffs were on their trip, Clark violated this agreement and impregnated homeless Carroll who had a history of being homeless and staying in community shelters.  Clark initially told Plaintiffs about Carroll on October 30, 2013 (*See* Exh. 2) wherein he acknowledged that no one else was to be in the residence. Playing upon the Plaintiffs' good nature when they returned from the trip, Clark and Carroll (hereinafter referred to as the "House Sitters") begged them to allow the couple to stay in the residence as house sitters. Moreover, Carroll had an adolescent child, Samantha, from a previous non-marital relationship, who would often stay on the Property[3].  Approving the stay and conditions, the Jacobses then provided another bedroom for the child and the soon-to-be-born illegitimate infant.  House Sitting services were in return for their temporary lodging and they were limited to their upstairs living space, kitchen, and backyard.  (*See* Affidavit Exh. 3, ¶ 10).  Plaintiffs later learned that Carroll could not be the "fiancé" of Clark because she was legally married to another man without any plans of divorcing because of financial benefits including the public assistance she received. Without success, Plaintiffs attempted to get Carroll to find employment elsewhere to support her "family."

---

[3]  Carroll lost custody to the father because of multiple school tardies and using funds for the child for personal benefit.

27.    Clark and Carrol were both bound as House Sitters by the NDNCA. Since they claimed they were "penniless," Plaintiff Handler Jacobs gave them a cash allowance, whether they performed any "work," errands or not. This continually increased over time from $40 to $80 per week.  The couple insisted on cash payments because neither one had a bank account[4]. Plaintiffs gave them use of a vehicle with a gas card and paid auto insurance, paid both House Sitters' monthly cell phone services, paid for a full cable television package, many meals in restaurants for the couple and their children, gifts, and all this was above and beyond their free room and board and cash allowance which consisted of well over $17,000 (*See* Exh. 4). Years passed and the Plaintiffs made 12 trips away from the residence up to December 2016. During the preceding year, Clark became abusive to Plaintiff Jacobs and the couple were subjected to elder abuse.  The Plaintiffs desired the House Sitters, with their "two children," to vacate the property and attempted to find other housing for the Clark family.  Unfortunately, the Jacobses inadvertently had become unwitting victims of a master con man which resulted in their being arrested on December 11, 2016. Plaintiffs' attorneys told them that the prosecution considered them victims of the "architect" con man.

28.    On or about December 15, 2016, a photographer and journalist from the *Albuquerque Journal* arrived at the front door, despite a "No Trespassing" sign on the front yard (*See* Exh. 5), and apparently allowed herself to be interviewed which is forbidden by the NDNCA.  Carroll defamed the Jacobses in the article, making fraudulent statements. The press couple photographed the residence without written permission from the Jacobses and violated the sanctity of the home.  A separate lawsuit concerning the *Albuquerque Journal* violations is pending.

---

[4] Plaintiff Handler Jacobs kept a log of payments, but that was destroyed by Clark and Carroll.

29.    The photo caption in the *Albuquerque Journal* stated that "*Now Carroll is worried the house will be seized and she won't have a place to live.*"  In an attempt to keep Plaintiffs in custody, Carroll contacted the Southern District of New York ("SDNY") prosecutor and provided false information.  Proof of her mendacious behavior and the discovered check forgeries were provided by Mr. Peter Staiti, Esq. (the Jacobs' family attorney and former JAG officer, "Mr. Staiti") to the prosecutors and that, along with the prosecutors discovering that Carroll's false information, did not match the information in Plaintiffs' cell phones and computers.  The U.S. District Court then ordered the House Sitters to leave Plaintiffs' home.  Before they left in late November 2017, the couple and approximately 12 unauthorized dwellers in Plaintiffs' home, vandalized the property[5], and committed grand theft in stealing most of Plaintiffs' personal property (that Clark was incumbent to protect) as reported to the Albuquerque Police Department ("APD") (*See* Exh. 6 and Exh. 23). Plaintiffs learned that Defendants held garage sales of their possessions (*See* Exh. 7) and telling their neighbors that the Jacobses were dead (*See* Exh. 3, ¶ 52).  Plaintiffs' losses amounted into the multi-millions of dollars (*See* Exh. 21) including the theft of Plaintiff Jacobs' career-long photographic equipment and images, and the house sitters murdered their cats.

30.    Plaintiff Jacobs discovered the Cannes photograph (*See* Exh. 14, image #1) in the pages of the *Albuquerque Journal* on September 28, 2019 and the last correspondence the Jacobses had from the APD, concerning the theft, was on November 18, 2020.

31.    Plaintiffs filed a complaint with the New Mexico Attorney General's office (*See* Exh. 22).

---

[5]  In violation of NM Stat § 30-15-1 (2021), vandalism is criminal damage to property consisting of intentionally damaging any real or personal property of another without the consent of the owner of the property.

32.    Plaintiffs appealed the APD with the Chief Administrative Officer under the Albuquerque's mayor, on May 26, 2021 (*See* Exh. 8).

33.    Since then, Plaintiffs have been attempting to find the actual whereabouts of the Defendants.

## V.    FACTUAL ALLEGATIONS

### Statute of Limitations, New Mexico Discovery Rule, and Continuing Tort Doctrine

34.    Actions founded upon any bond, promissory note, bill of exchange or other contract in writing shall be brought within six years. (NMSA § 37-1-3(A)).  This Complaint is timely filed.

### *New Mexico Discovery Rule*

35.    "The New Mexico Supreme Court has held that the limitation period of § 41-4-15(A) runs from the time when an injury manifests itself and is ascertainable. *Maestas v. Zager.*, 141 N.M. 154, 159, 152 P.3d 141, 146 (2007)." *Foley v. City of Roswell*, No. CIV 10-0203 RB/GBW, at *6 (D.N.M. Feb. 6, 2012).

36.    The statute of limitations begins to run when an action accrues. *Garcia*, 1995-NMSC- 019, ¶ 14, 893 P.2d at 433. "The date from which the statute of limitations begins to run may be extended by New Mexico's discovery rule, under which a 'cause of action does not accrue until the plaintiff discovers' the injury." *Elm Ridge Expl. Co.*, 721 F.3d at 1210 (quoting *Wilde v. Westland Dev. Co.*, 2010-NMCA-085, ¶ 18, 241 P.3d 628, 635; emphasis added) (applying discovery rule to claims of conspiracy and breach of contract).

37.    Here, under the New Mexico discovery rule, the statute of limitations begins to run "when the **plaintiff acquires knowledge of facts, conditions, or circumstances** which would cause a reasonable person to make an inquiry leading to the discovery of the concealed cause of

action" this is referred to as "inquiry notice." *Yurcic v. City of Gallup*, 2013-NMCA-039, ¶ 9,

298 P.3d 500, 503 (internal quotation marks omitted); *see Gerke v. Romero*, 2010-NMCA-060, ¶

10, 237 P.3d 111, 115.  Plaintiff Handler Jacobs did not make her first discovery until November

29, 2017 and made her initial ascertainable APD report on or about December 5, 2017 (*See* Exh.

9).  It was during the month of December 2017 that she discovered the identities of the

Accomplice Defendants who Plaintiffs allege that they knew Clark and Carroll were not the

owners of the Property and the chattel which they stole.  Plaintiff Handler Jacobs then spent

January into March 2018 going through debris at the residence to ascertain the damage and what

personal property had been stolen by all Defendants.  On March 9, 2018 (*See* Exh. 6), she

contacted the APD to add the list of stolen items to the original theft report (*See* Exh. 10) but was

denied. Plaintiff Jacobs did not discover and ascertain photographic equipment and negatives

stolen until after he returned home on July 19, 2019. (Emphasis added).

      38.    Moreover, Plaintiffs are continuing to seek information to fully ascertain the losses,

i.e., Plaintiff Jacobs' exclusive images on negatives and transparencies and their whereabouts.

***Continuing Tort Doctrine***

      39.    A tort is an act or omission, other than a breach of contract, which gives rise to

injury or harm to another, and amounts to a civil wrong for which courts impose liability. In

other words, a wrong has been committed and the remedy is money damages to the person

wronged. "Tortious conduct" has been defined as an act or omission that subjects an individual

to liability under the principles of tort law. In tort law, conduct may be actionable whether the

actor intends harm or not. Nonetheless, the most common of the tort causes of action require a

finding that a defendant acted negligently, recklessly, or intentionally. *Sandoval v. Baker Hughes*

*Oilfield*, 146 N.M. 853, 872 (N.M. Ct. App. 2009).

40.   "Under New Mexico law, a "willful" or "malicious" tortious act constitutes more than mere negligence; it is a purposeful act or conscious omission to do an act with the intent to do wrong or cause injury. *Tessier v. White*" *Matthews v. State*, 113 N.M. 291, 297 (N.M. Ct. App. 1991)

41.   Under the continuing violation doctrine, "where a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury." *Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1430 (10th Cir. 1996) (quoting 54 C.J.S. Limitation of Actions § 177 (1987) (applying New Mexico law); *Anderson Living Tr. v. WPX Energy Prod., LLC*, 27 F. Supp. 3d 1188, 1214 (D.N.M. 2014). "In other words, 'the statute of limitations does not begin to run until the wrong is over and done with." (quoting *Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir.1983)). *Id.* The treatise cited by the Tenth Circuit explicates the doctrine further. *Herrera v. City of Espanola*, No. 1:20-cv-00538-KWR-SCY, at *8 (D.N.M. Mar. 3, 2021)

42.   In this instant Complaint, Plaintiffs aver that a continuing violation occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation satisfies the letter of the law. *See  Herrera v. City of Espanola*, No. 1:20-cv-00538-KWR-SCY, at *8 (D.N.M. Mar. 3, 2021). "A tort is considered "continuing" only if the defendants' conduct is ongoing. *Mata v. Anderson*, 635 F.3d 1250, 1253 (10th Cir. 2011)" *Carroll v. Routh*, No. 19-8065, at *5 (10th Cir. May 5, 2020)

43.   Defendant House Sitters, with the assistance of the Accomplice Defendants, did commit the ongoing torts of trespass, larceny and conversion by stealing Plaintiffs' chattel.  The chattel has not been returned to Plaintiffs and therefore a continuing violation exists on each and every purloined item as of this writing (*See* ¶ 37 above). The House Sitters are further subject to

a continuing violation with the theft of Plaintiffs' car.  Clark is subject to a continuing violation

with the theft of Plaintiff Handler Jacobs' firearms.

### Breach of House Sitter Contract

44.   Plaintiffs allege that the breach of the contract is the nexus of the acts by the

Defendants in this instant Complaint. All claims are a result of violations of the House Sitter

agreement between the Plaintiffs, Clark and subsequently the full range of Defendants. *See* NM

Stat § 37-1-3 (2021).

45.   On or about October 3, 2013, homeless Clark signed the five-year NDNCA with the

Jacobses as a house sitter at their property (See Exh. 1) for the upcoming trip Plaintiffs were

making to visit their grandchildren and PhD son in Boston, MA.  Plaintiffs provided one upstairs

suite bedroom and full bath for his quarters.  Clark was forbidden from having anyone else in the

home (*See* Exh. 2). While on the trip, Clark violated this agreement and impregnated also

homeless Carroll. Playing upon the Plaintiffs' good nature, when they returned from the trip,

Clark and Carroll begged them to allow the couple to stay in the residence as house sitters.

House Sitting services were in return for their temporary lodging.

46.   In the U.S. Department of Labor, Office of Administrative Law Judges, defines

House Sitters as Service Occupation 309.367-010 HOUSE SITTER:

> ***Occupies and oversees house to maintain order and security of property*** and
> conduct necessary business transactions during temporary absence of owner, renter,
> or other occupant: Monitors entrances to property and secures locks and other devices
> to prevent access of unauthorized persons. Answers telephone and doorbell, takes
> messages, and forwards information to employer as requested. Forwards or files mail.
> Pays current bills from designated funds and makes deposits to accounts as required.
> Cleans, vacuums, and dusts house, using vacuum cleaner and other housecleaning
> aids. Feeds and waters pets and takes ill pets to veterinarian for treatment. Inspects
> utilities, such as plumbing and air-conditioning, to detect problems requiring services
> of repairer and contacts repair establishment to arrange for necessary repairs. May
> care for swimming pool or grounds or perform other related duties. (Emphasis

12

added).

47.     The agreement also provided for security of "Confidential Information" as the
Jacobses were developing an entertainment project ("Northern Corridor"). Clark had previously
been a security officer, on occasion, for the Jacobs' NSU.  The House Sitters willfully violated
the NDNCA as house sitters for the Jacobses and caused further damage by allowing 12 other
individuals to live on the property, along with several dogs (*See* Exh. 3, ¶ 12), while the
Plaintiffs were away between December 14, 2016 and November 2017. The residence has five
bedrooms with two being occupied by the House Sitters[6].  However, this couple relocated to
Plaintiffs' master bedroom suite where they completely emptied Plaintiffs closets, dressers and
all belongings and replaced them with their own effects. Plaintiffs were left without any clothing,
including socks and underwear. The couple then proceeded to rent out, without authority, the
four upstairs bedrooms and a downstairs private office to the Accomplice Defendants. The
families put the minor children in "caged" room by cutting the doors in half where it was found
that the children were playing in the dog feces and smearing it on the walls. Mr. Staiti was so
incensed by this sight that he insisted on filing a child abuse report. (*See* Exh. 3, ¶ 27).

48.     The House Sitters materially breached the Agreement between them and the
Plaintiffs. By the operation of the NDNCA, "Brandon Clark and any other associated parties" are
bound for House Sitter in exchange for housing (from Gallup Security)." Therefore, all of the
Defendants were bound by the NDNCA while failing to abide by same.

49.     To restate pertinent points in the NDNCA, in paragraph 1 under **"Confidential**
**Information** … *this Agreement means any oral and/or written non-public, confidential,*
*proprietary, and/or secret information*, including: trade secrets; ideas, business concepts,

---

[6] It has been established that Clark and Carroll had permission for two upstairs bedrooms and one full
bath.

discoveries or inventions; ***graphics***, demonstrative, samples, ***flow charts***, products… financial information or statements… ***personnel information*** … or ***business relationships***." (Emphasis added).

50.     Furthermore, in paragraph 2, "Confidential Information that is protected under this Agreement includes: (i) tangible information (such as ***written materials***, models and specimens)… ; (ii***) information in oral or visual form that is identified as being Confidential Information at the time of disclosure***…; or (iii) information that, given the nature of the information or the circumstances surrounding its disclosure, reasonably should be considered as Confidential Information. ***In addition, if a party is on the premises of the other party lo this Agreement and inadvertently receives information not related to this Agreement that a reasonable person would discern to be confidential to that other party, that information shall be treated as Confidential Information under this Agreement.*** (Emphasis Added).

51.     Paragraph 3 refers to Ownership of Confidential Information. It states that "[i]n no way does this Agreement provide the Recipient any ownership rights or other rights of claim (including intellectual property rights) to the Discloser's Confidential Information, or its derivatives." In another way, it states that the House Sitters did not have any ownership of any property (i.e. chattel) which belonged to the Plaintiffs.

52.     Defendants House Sitters had an absolute Obligation to Protect Confidentiality and the Jacobs' chattel. At paragraph 5, "The Recipient agrees to treat all Confidential Information as strictly confidential and agrees not to disclose the Confidential Information to any third party for any reason whatsoever." Specifically, "No press or other publicity release, and or disclosures, will be issued to the general public…"

53.   Per paragraph 9 in the NDNCA, Plaintiffs are afforded various remedies. "The Recipient understands and agrees that, in the event of the Recipient's breach or threatened breach of this Agreement, the Discloser may: (ii) seek direct, consequential, indirect, or punitive damages, and that such damage calculations may include lost potential profits or cost savings; and (iii) seek all other available legal and equitable remedies."

54.   The Jacobses, from time-to-time, clarified Clark and Carroll's duties which were acknowledged by the house sitters and stated in Clark's affidavit (*See* Exh. 11).

55.   The term of the Agreement began on the Effective Date and continued for a period of five (5) years, i.e., from December 3, 2013 through December 3, 2018. *See* paragraph 11 in the NDNCA. Moreover, the House Sitters were seen with a moving truck and thereafter vacated the property no later than November 22, 2017.

### Material Breach

56.   The court in *Keller v. Arrieta*, 20-cv-0259-KG/SCY, at *15 (D.N.M. May 13, 2022) opined that "New Mexico Courts have defined a "material" breach [of contract] as "the failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Famiglietta v. Ivie-Miller Enterprises, Inc.*, 1998-NMCA-155, ¶ 17 (internal quotations and citations omitted)."

57.   The *Famiglietta* court adopted the Restatement's five factors for deciding the materiality of a breach of contract:

> (1) the extent to which the injured party will be deprived of the benefit he or she reasonably expected to receive from the contract;
> (2) the extent to which the breaching party will suffer forfeiture if the breach is deemed material;
> (3) whether the injured party can be adequately compensated in damages for the breach;
> (4) the likelihood that the breaching party will cure his or her failure to perform under the contract; and,

(5) whether the breaching party's conduct comported with the standards of good faith and fair dealing.

*Id.* at ¶ 18 (citing Restatement (Second) Of Contracts § 241). *Keller,* 20-cv-0259-KG/SCY, at *15-16 (D.N.M. May 13, 2022). Alternately stated, a material breach[7] of contract occurs if one party fails to perform their contractual obligations and causes harm to the other party, the harmed party can recover damages arising from the breach.

58.    "To state a valid cause of action for breach of contract, a plaintiff must establish three elements: (1) a valid contract; (2) a material breach; and (3) damages*." Collins v. Certain Underwriters at Lloyd's, London Subscribing to Policy No. B0723AI00342A10*, 2012 WL 13014690, at *2 (S.D. Fla. Apr. 24, 2012) (J. Turnoff) (internal quotation omitted). "A 'material breach' of a contract is a failure, without legal excuse, to perform any promise or obligation or that goes 'to the essence of the contract.'" *Oriole Gardens Condos., III v. Indep. Cas. & Sur. Co.*, 2012 WL 718803, at *11 (S.D. Fla. Mar. 6, 2012). The breaching parties conduct did not comport with the standards of good faith and fair dealing.

59.    Element 1: The Plaintiffs have presented the lawful NDNCA and other documentation that supports the existence of a house sitter contract between Clark, Carroll, and the Accomplice Defendants as a result thereof.

60.    Element 2: Plaintiffs aver that the following breaches (but not limited to) did occur after December 11. 2016, where Defendant House Sitters,

    a.    did occupy the property yet did not maintain order and security of property;

---

[7] *Camino Real Mobile Home Park Partnership v. McCarson,* 119 N.M. 436, 445 (1995) ("Once a party has established a cause of action for breach of contract by showing the existence of a contract, breach thereof, causation, and actual damage, he or she may be awarded nominal damages and costs, even when failing to establish the amount of compensatory damages."; *Stockmen's Guar. Loan Co. v. Cooper*, 24 N.M. 495, 498 (1918) ("It is elementary that there can be no recovery for breach of contract in the absence of allegations and proof that the party seeking to recover has performed all the conditions precedent of the contract by him to be performed, or has tendered performance of the same.").

b.   did not conduct necessary business transactions during temporary absence of owner;

c.   did not monitor entrances to property and prevented access of unauthorized persons;

d.   did not have the written authority to allow and receive payments from Accomplice Defendants to reside on the property, i.e.; seven adults and five minor children;

e.   did not pay current bills from designated funds and make deposits to accounts as required;

f.   did not keep the residence clean as evidenced upon Plaintiff Handler Jacobs return on November 28, 2017 (*See* Exh. 7)

g.   did not feed and water pets[8] in violation of NM Stat § 30-18-1(B)(1)(2) and (E)(1);

h.   did cause the deaths of Plaintiffs' pets in violation of NM Stat § 30-18-1(E)(2);

i.   did commit larceny by stealing Plaintiff Handler Jacobs' three firearms in violation of 18 U.S.C. §§842(h) and 922(i);

j.   did commit grand theft auto by stealing the company vehicle NMSA § 30-16D-1, Per NMSA § 30-16D-2 (*See* Exh. 3, ¶ 49);

k.   did steal $3,400.00 in company cash at the residence which was to be paid to employees of NSU (*See* Exh. 3, ¶ 42);

l.   did organize and participate in the theft of Plaintiffs chattel in excess of millions of dollars including priceless heirlooms and irreplaceable possessions;

m.  did convert stolen chattel and the removal of chattel across State lines;

***Accomplice Defendants,***

n.   Jones, without authority from Plaintiffs, did operate an unlicensed auto repair business[9] (and possibly a chop shop) out of the property's garage in violation of NMSA § 30-16D-7;

o.   did participate in the theft of Plaintiffs chattel in excess of millions of dollars including priceless heirlooms and irreplaceable possessions;

---

[8] Plaintiffs had two male cat and one female cat who were murdered by Defendants. One or two of them are buried in the property's backyard.
[9] Fire & Ice Auto Repair (*See* Exh. 13)

p.  A.Swan did steal Plaintiff Handler Jacobs' Tommy Bahama suitcase (*See* Exh. 3, ¶ 25);

q.  aided and abetted all other Defendants in the illegal acts;

r.  A.Carroll did use a false name while at the Plaintiffs' Property (*See* Exh. 12);

s.  Chioda may not have lived at the Property, only visited, but Plaintiffs allege did aid and abet Clark and Carroll;

***Defendant Carroll did,***

t.  reveal non-public, confidential, proprietary, and/or secret information to the press (NDNCA ¶ 1);

u.  lie to the reporter and photographer from the *Albuquerque Journal*;

v.  reveal financial information to the press (NDNCA ¶¶ 1, 5);

w.  reveal personnel information (NDNCA ¶ 1);

x.  forge stolen company checks and cashed them in the amount of $10,230.74. In December 2017 it was discovered that Ms. Carroll had forged five checks during April and May in the amount of $1,449.58 that she was able to negotiate in several check cashing businesses in Albuquerque. (*See* Exh. 8 pp. 8-9);

y.  commit theft of Plaintiff Handler Jacobs' identity in violation of New Mexico Statutes § 30-16-24.1;

z.  contribute to copyright violation by allowing the theft of Plaintiff Jacobs' copyrighted Cannes photograph by the press;

aa. rummage through the master bedroom private chest of drawers and unlawfully allowed Plaintiff Handler Jacobs' USMS badge (Exh. 14, image #2) to be photographed and taken in violation of 18 U.S.C. § 701[10];

bb. allow the trespassing press reporter and photographer from the *Albuquerque Journal* to enter the residence, gave a disparaging interview, rummaged through

---

[10]   "Whoever manufactures, sells, or possesses any badge, identification card, or other insignia, of the design prescribed by the head of any department or agency of the United States for use by any officer or employee thereof, or any colorable imitation thereof, or photographs, prints, or in any other manner makes or executes any engraving, photograph, print, or impression in the likeness of any such badge, identification card, or other insignia, or any colorable imitation thereof, except as authorized under regulations made pursuant to law, shall be fined under this title or imprisoned not more than six months, or both." 18 U.S.C. § 701.

18

confidential files in Plaintiff Jacobs' private office while allowing them to be photographed (*See* Exh. 14, image #5)); and .

    cc. provide false claims against Plaintiff Handler Jacobs to the Assistant U.S. Attorney in New York which resulted in Clark and Carroll being ordered out of the property in violation of 18 U.S.C. § 1001(a)(2) and § 30-39-1 NMSA 1978.

61.    Element 3: Damages are enumerated throughout this Complaint.

### Civil Conspiracy as a Result of Breach of Contract

62.    Civil conspiracy is a tort or civil wrong. Instead of the government punishing the person for committing the conspiracy, a private person will be the one who sues and is awarded civil damages if they are injured by a civil conspiracy. Plaintiffs allege that Accomplice Defendants acted in accord with the House Sitters to injure the Jacobses by moving into the Property, making it their domicile, and participating in the larceny (*See* Exhs. 15-19)

63.    Conspiracy, like larceny, can also be a continuing crime. *See State v. Villalobos*, 120 N.M. 694, 697, 905 P.2d 732, 735(Ct.App. 1995) (stating that "a conspiracy may continue for an extended period of time and across jurisdictional lines").  As such, civil conspiracy only exists when a person is injured as a result of an unlawful act in furtherance of the conspiracy.  Additionally, conspirators who injure an individual as a result of their unlawful act in furtherance of a conspiracy are jointly and severally liable for the injured person's damages. This means that any of the conspirators may be liable for all of the injured party's damages, independent of the other conspirators.

64.    In this instant complaint, the House Sitters conspired amongst themselves to injure Plaintiffs by, but not limited to, theft of firearms, destruction of property, theft of chattel, conversion, aided trespass (*See* Exh. 5) and speaking to the press. Without authority Clark shut down Plaintiffs' NSU company, then the House Sitters stole cash funds meant for NSU employees and Carroll forging checks from the NSU operating account.  Moreover, the

Accomplice Defendants conspired with the House Sitters to continually trespass on Plaintiffs' property as well as steal chattel that did not belong to them with the intent of permanently depriving[11] Plaintiffs of same.  Furthermore, to keep the conspiracy secret, Plaintiffs aver that all Defendants maintain a trust between them allowing for continuing damages as of this writing.

### Aiding and Abetting with Contract Interference

65.    Under NM Stat § 30-1-13 (2021) aiding and abetting is assisting in the commission of a crime[12].  People who engage in aiding and abetting are more commonly referred to as accomplices. Accomplices must intentionally be involved in the planning of the crime and want the crime to be carried out. Even if they do not actually commit the crime themselves, accomplices help the offender execute or attempt to execute the crime. On other words, in order for an individual to be guilty as an aider and abettor, all that was necessary was that he share the criminal intent of defendant and that a community of purpose and partnership in the unlawful undertaking be present. *State v. Ortega*, 1966-NMSC-185, 77 N.M. 7, 419 P.2d 219; *State v. Luna*, 1979-NMCA-048, 92 N.M. 680, 594 P.2d 340.

66.    In this instant Complaint, Plaintiffs aver that the Accomplice Defendants did not only assist the House Sitters in grand larceny, they themselves benefited from the taking of Plaintiffs' chattel.  By participation in the trespass and larceny, the Accomplice Defendants also interfered with the Clark contract with which they are further bound.

---

[11] To prevail on such a [civil-theft] claim, the plaintiff must "establish that (1) defendant knowingly obtained control over his property without authorization and (2) defendant did so with the specific intent to permanently deprive him of the benefit of the property." *Huffman v. Westmoreland Coal Co.*, 205 P.3d 501, 509 (Colo. App. 2009). *Welch v. Saunders*, No. 17-1202, at *7 (10th Cir. Dec. 29, 2017).

[12] *State v. Carrasco*, 124 N.M. 64 (N.M. 1997)

**Theft of Firearms by Defendant Clark**

67.   Under 18 USC §§842(h)and 922(i), Defendants (A) May not receive, possess, conceal, store, pledge or accept as security for a loan, barter, sell or ship or transport across a state line any stolen firearm, ammunition or explosive; and (B) may not steal or unlawfully take or carry away a firearm from the person or premises of a firearms licensee.

68.   Plaintiffs, upon information and belief, aver that Clark took possession of Plaintiff Handler Jacobs' three firearms, removed them from the residence and transported them first to Arizona, then Colorado, Texas and back to Arizona. Plaintiffs had informed the Albuquerque Police Department ("APD") and included numbers available. According the APD, they referred the theft to the  National Crime Information Center ("NCIC") prior to March 9, 2018 (*See* Exh. 6, p. 6).

**Intentional Tort of Trespass on Plaintiffs' Real Property**

69.   Plaintiffs claim that Accomplice Defendants did intentionally trespass on their "Private Property: No Trespassing" signed ("Sign") Property and contrary to NM Statute § 30-14-1(A) in that they did not have written permission from the Jacobses. The Sign (*See* Exh. 5), which has been posted on the Property since 2011, was clearly displayed in the front yard of Plaintiffs' Property and the mere entering of the Property by Accomplice Defendants was a violation thereof.  Furthermore, Accomplice Defendants remained on the Property without required written permission or knowledge of the Plaintiffs.

70.   Any person who enters upon the lands of another without prior permission and injures, damages or destroys any part of the realty or its improvements, including buildings, structures, trees, shrubs or other natural features, is guilty of a misdemeanor, and he shall be liable to the owner, lessee or person in lawful possession for civil damages in an amount equal to

double the value of the damage to the property injured or destroyed. § 30-14-1(D). (*See* Exh. 7). Further, continuing trespass broadly can refer to any recurring infringement of another person's rights and in the modern context generally refers to trespass onto the land or property of another repetitiously or without ever ceasing[13]. In this instant case, Accomplice Defendants were continually trespassing with a new violation each day and therefore in violation of the NDNCA.

### Defendant Carroll made Fraudulent Statements to an Assistant U.S. Attorney

71.    In or about May 2017, Plaintiff Handler Jacobs was informed by her counsel, Mark Gombiner ("Mr. Gombiner") of the Federal Defender's Office, that Carroll had contacted Assistant U.S. Attorney Daniel Noble ("Mr. Noble"), of the Southern District of New York.  She was told that Carroll had sent Noble false and disparaging writings about her, which in turn were shown to her by Mr. Gombiner.  Then, in or about July 2017, Plaintiffs' New Mexico family attorney, Mr. Staiti, provided to Plaintiff Handler Jacobs copies of forged checks by Carroll in the amount $9,730.74 (*See* Exh. 8, p. 9) which Carroll had presented and cashed from Plaintiff Handler Jacobs' NSU account.  Mr. Staiti also gave them to Mr. Gombiner and filed the first police report in New Mexico on or about August 4, 2017 regarding Carroll and the forgeries. (*See* Exh. 6, p. 1 et seq).  In or about August 2017, Mr. Gombiner related to Plaintiff Handler Jacobs that Carroll again had contacted Mr. Noble with false statements regarding Plaintiff Handler Jacobs' text messages on her cell phone.  The specifics of her comments were related to Plaintiff Handler Jacobs by Mr. Gombiner.  Upon the prosecution reviewing such messages and realizing that the account by Carroll was false with her attempting to prevent Plaintiff Handler Jacobs from returning to the residence on bond, she was informed by Mr. Gombiner, that her bond was approved. Mr. Staiti then informed Plaintiff Handler Jacobs that the U.S. Attorney's

---

[13] Cornell Law.  https://www.law.cornell.edu/wex/continuing_trespass#

office had ordered the House Sitters to vacate the Property. At this point in time, neither Plaintiff Handler Jacobs nor Mr. Staiti know of the Accomplice Defendants living in the residence. Carroll had refused to allow Mr. Staiti into the residence (*See* Exh. 3, ¶ 11).

72.    "To prove a false statement in violation of 18 U.S.C. § 1001, the government must show that the defendant: (1) knowingly and willfully, (2) made a statement, (3) in relation to a matter within the jurisdiction of a department or agency of the United States, (4) with knowledge of its falsity." *United States v. Duclos*, 214 F.3d 27, 33 (1st Cir. 2000).

### Intentional Tort of Continuing Trespass on Chattel *Per Se*

73.    Plaintiffs aver that that all Defendants are part and party of a scheme of continuing trespass *per se* against the house sitter contract with the House Sitters. The accrual date for a cause of action for a claim for a continuing trespass is each day of the trespass. *McNeil v. Rice Engineering & Operating, Inc.*, 2006-NMCA-015, 139 N.M. 48, 128 P.3d 476, cert. denied, 2006-NMCERT-002, 139 N.M. 339, 132 P.3d 596. In this instant case, the accrual date has not been reached as the Defendants continue to trespass daily on Plaintiffs' chattel.

74.    A trespass to chattels could occur at common law if there was an intentional "intermeddling with a chattel in the possession of another," with "intermeddling" meaning to bring about a physical contact with the chattel. *See* Restatement (Second) of Torts § 217 (1965)." *United States v. Otero*, 22-10068-JWB-01,-02, at *18 (D. Kan. Aug. 18, 2023)

### Intentional Tort of Cruelty to Animals Causing Death in Violation of Contract

75.    Under NMSA 30-18-1(E) Extreme cruelty to animals consists of a person (1) intentionally or maliciously torturing, mutilating, injuring or poisoning an animal; or (2) maliciously killing an animal. Further, NM Stat § 30-18-1(B)(1)applies in the instant case. In *State v. Cleve*, 1999 NMSC 177, 127 N.M. 240, 980 P.2d 23, the Supreme Court concluded that

"the Legislature intended that the phrase 'any animal' denote domesticated animals and wild animals in captivity".

76.    Plaintiffs had three beloved domestic house cats (Chase, Chance and Safra) in their residence since approximately September 2009 for the twins and July 2011 for Safra, which were to be cared for by the House Sitters. When Plaintiffs left their home on December 11, 2016, the cats were in excellent health. Upon Plaintiff Handler Jacobs' return to their residence on November 28, 2017, the cats were missing while later finding grave mounds in the property's backyard that appeared to be the cats with lime around the mounds.  Clark had a propensity to discharge firearms in the home - especially one time while the Plaintiffs were in the kitchen Clark discharged his weapon from the upstairs bedroom with the bullet lodging itself in the kitchen's pantry door inches away from Plaintiff Handler Jacobs.

77.    Furthermore, Plaintiffs allege that Defendants may have tortured and murdered the felines in violation of the Preventing Animal Cruelty and Torture Act' ("PACT"), PublicLaw 116-72 (18 U.S.C. § 48 Chapter 3).

## Intentional Tort of Continuing Grand Larceny

78.    Under paragraph 2 of the NDNCA, the House Sitters (and by contract the Accomplice Defendants) were obligated to protect all of Plaintiff's chattel including animals. Further, all Defendants did not have any form of ownership over Plaintiff's chattel.  For a count "based on larceny, separate allegations of each element of a civil larceny claim under New Mexico law;" *Midas Auto Sales, Inc. v. Holley (In re Holley)*, No. 7-12-12608 Ta, at *6 (Bankr. D.N.M. May 9, 2013).  New Mexico Stat § 30-161(A) states that Larceny consists of the stealing of anything of value that belongs to another.

79.    With the "intent to seal [sic] continuing, the thief carrying away the goods becomes guilty of a complete larceny in every county or locality into which he takes them while his intent to steal continues." *Clark*, 129 N.M. 194, 197 (N.M. Ct. App. 2000).  Therefore, Plaintiffs is informed and therefore alleges that all Defendants are subject to the Continuing Tort Doctrine (i.e., counties of Bernalillo (NM),  Mohave (AZ), Mariposa (AZ), Pima (AZ), Pueblo (CO), Denver (CO), Valencia (NM), Harris (TX), Roosevelt (NM), Eddy (NM), and Sandoval (NM)).

80.    Under N.M. Stat. Ann. Section 30-16-1(A), Grand larceny "involves the person taking the property of another and moving it from one location to another, with the intent to steal ownership of that item and Grand theft refers generally to the taking of any property over $250 in value. Under grand theft, there also can be burglaries, robberies and larcenies. In this Complaint, Plaintiffs not only aver that Defendants stole an enormous amount of personal property, but the House Sitters did embezzle Plaintiffs' motor vehicle when they embezzle or convert a vehicle for personal use with the intent to deprive Plaintiffs of the vehicle. NMSA § 30-16D-1, Per NMSA § 30-16D-2.

### Intentional Tort of Conversion as a Result of Breached Contract

81.    Plaintiffs aver that all Defendants committed Conversion at the Property which continues to this filing.  The court in *Phillips v. Utah State Credit Union*, 811 P.2d 174, 179 (Utah 1991) opined that "Conversion is an act of willful interference with chattel done without lawful justification by which the rightful owner of the property is deprived of its use and possession." *Albright v. Attorneys' Title Insurance Fund*, No. 2:03CV517, at *22-23 (D. Utah July 28, 2008).  In other words, conversion is the wrongful exercise of dominion or control over property to the detriment of the rights of one entitled to possession. *Bel–Bel Int'l Corp. v. Cmty. Bank of Homestead*, 162 F.3d 1101, 1108 (11th Cir. 1998). Plaintiffs aver in this instant

Complaint that all Defendants knowingly obtained or used the Plaintiffs' property with the intent

to, either temporarily or permanently deprive Plaintiffs of a right to the property or a benefit

therefrom, or alternatively, with the intent to appropriate the property to Defendants' own use or

to the use of any person not entitled thereto.

82.   In order to prevail on a common law conversion claim, a plaintiff must prove that

the defendant: "(1) engaged in an unauthorized act which deprived [p]laintiff of its property

permanently or for an indefinite amount of time; and (2) either (a) [p]laintiff had a right to

possession of the property and demanded its return at a time when the [d]efendant had

possession and the demand was not or could not be met; or (b) such a demand and refusal were

unnecessary because it would have been futile." *Belleview Biltmore Partners, LLC v. Noah &*

*Assoc.*, No. 17-20460-CV, 2018 WL 1795480, at *5 (S.D. Fla. Mar. 13, 2018).

83.   Plaintiffs can satisfy each one of the factors above in that they have proof that the

stolen items were theirs from the time that Clark moved into the residence in 2013. Moreover,

none of the Defendants have attempted to contact Plaintiffs seeking a method for the return of

the stolen chattel. A former attorney hired to represent NSU by their insurance company, Nathan

H. Mann Esq. ("Mann") of Gallagher, Casados & Mann PC, had deposed Clark and was aware

of his location but refused to provide that information to Plaintiffs despite the fact that Plaintiffs

paid the insurance that was paying his bill. In correspondence, Mann refers to Plaintiff Jacobs as

his client.  At that point in time Mann only informed Plaintiff Handler Jacobs that Clark was

residing in Denver, Colorado.

84.   Plaintiffs found in their garage; tables set up for a yard/garage sale which was

confirmed by neighbors (*See* Exh. 3, ¶ 52). Plaintiffs' personal property was found to have price

tags (*See* Exh. 7). Further, Defendants told neighbors that they were selling the goods because

Plaintiffs were dead (*See* Exh. 3, ¶¶ 52 and 53). Plaintiffs also found boxes of new products which would only have been purchased by and for the House Sitters' (and Accomplice Defendants') personal use thereby using funds from converted Plaintiffs chattel and/or theft by forgery *(See* Exh. 3, ¶ 45).

### Forgery and Identity Theft in Breach of Contract

85.     Plaintiffs allege that Carroll committed 27 counts of forgery in violation of NM Stat § 30-16-10(A) (2021) wherein forgery consist of (1) falsely making or altering any signature to, or any part of, any writing purporting to have any legal efficacy with intent to injure or defraud (under Article 16 – Larceny). On January 9, 2019, the APD report states "Melissa will be charged for the fraudulent checks that she wrote in Ruby's name." (*See* Exh. 6, p. 13). However, this did not yet come to pass.

86.   Under 18 U.S. Code § 1344(2), it states that to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or **under the custody or control** of, a financial institution, by means of false or fraudulent pretenses, representations, or promises. In this instant case, Carroll did obtain monies from Washington Federal Bank, who was the custodian of NSU accounts, using false representations through forgery. (Emphasis added).

### Invasion of Privacy Intentional Tort as a Result of Breach of Contract

87.   Restatement of the Law, Second, Torts, § 652. One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy if the intrusion would be highly offensive to a reasonable person.

88.   Plaintiffs allege that all Defendants after December 11, 2016 did intentionally intrude on their privacy by rummaging through Plaintiffs' chattel and allowing the Accomplice

Defendants access to the residence and chattel.  Moreover, in material violation of the NDNCA at paragraph 5, Carroll apparently did unlawfully allow members of the press to enter the residence and proceeded to be interviewed about Plaintiffs' private life.  Furthermore, Carroll committed malicious slander in her characterization of the Plaintiffs while also granting access to Plaintiff Handler Jacobs' USMS badge in the master bedroom and documents in Plaintiff Jacobs' private office (*See* Exh. 14, images #5 and 6).  Plaintiffs state that neither location was granted access to House Sitter Carroll as well as the great room where Carroll apparently was interviewed (*See* Exh. 14, image #3, 4 and 7).

89.   New Mexico also has laws related to the false light invasion of privacy. If an individual in New Mexico has been given publicity that casts him or her in a false light, and if the information is disclosed without his or her consent, then the individual may have a cause for action against the person who disclosed the information, even if there is no proof that any sort of defamation occurred. To claim that a false light invasion of privacy occurred, it must be established that the defendant shared details of the plaintiff that put him or her in a false light and that the false light would be considered offensive to a reasonable individual. Restatement (Second) of Torts § 652E(a).  Moreover, the false light privacy action differs from a defamation action in that "the injury in privacy actions is mental distress from having been exposed to public view." *See Time, Inc. v. Hill*, 385 U.S. 374, 384 n. 9, 87 S.Ct. 534, 540 n. 9, 17 L.Ed.2d 456 (1967).  In this instant case, Carroll did disclose information that placed Plaintiffs in a false light.

### Defamation as an Intentional Tort in Violation of the Contract

90.   Plaintiffs allege that Defendant Carroll, in violation of the NDNCA at paragraph 5, committed the tortious act of defamation by communicating patently false statements to the *Albuquerque Journal* reporter with malice.  Under New Mexico law, a prima-facie case for the

tort of defamation includes: (1) a published communication by the defendant; (2) the communication includes an asserted statement of fact; (3) the communication was concerning the plaintiff; (4) the statement of fact is false; (5) the communication was defamatory; (6) the persons receiving the communication understood it to be defamatory; (7) the defendant knew the communication was false or negligently failed to recognize that it was false, or acted with malice; and (8) the communication caused actual injury to the plaintiff's reputation. *Young v. Wilham,* 2017-NMCA-087, ¶ 55, 406 P.3d 988, 1007 as cited in *Dobry v. Lucero*, 2:21-cv-00598-JCH-LF, at *8-9 (D.N.M. Nov. 1, 2023).

91.    With regard to the above, Carroll's interview was published on or about December 15, 2016, the communication asserted "facts," communication concerning Plaintiffs, the "facts" were false and defamatory, Carroll knew that "facts" were false and acted with malice, and the communication did cause actual injury.

**Intentional Infliction of Emotional Distress Tort
in Breach of Contract Including Elder Abuse**

92.    Plaintiffs aver that the actions and behavior of Defendants were designed to inflict the maximum of emotional distress upon them. Moreover, Plaintiffs allege that the Housekeepers sought unfounded vengeance upon the Plaintiffs. Harm can come in many forms. It can be economic, like medical costs and loss wages. It can be non-economic, like pain and suffering or extreme emotional distress. It can be harm to a person's body, to a family member, or to property.

93.    If there is a harm or injury, then the law allows for compensation to the person harmed or injured in the form of damages. Damages are typically monetary in nature. In other words, Defendants pay someone money when they injure them due to our negligence. There is in most situations no other way to make a person "whole" again. It appeared to Plaintiffs that much

29

of the chattel discarded, burned or converted to cash.  All Defendants should pay for the aforementioned items because these are known as compensatory damages.  Monetary compensation is the only remedy available for these losses.  However, any of Plaintiffs' chattel that may still be in the possession of all Defendants, should be returned to Plaintiffs.

94.    Specifically, and in violation of the NDNCA, Accomplice Defendants trespassed on Plaintiffs' real property, all Defendants rummaged through personal and business files, stole Plaintiffs' tangible property, entered Plaintiff Jacobs' private office which had a "Private" sign on the door (*See* Exh. 20) with Defendants' G.Stone and J.Stone using it as a bedroom, all Defendants stealing Plaintiff Jacobs' business files and photographs, Carroll  violating the NDNCA by communicating misleading or false statements of fact to a regionally circulated newspaper.  Moreover, the murder of their beloved cats continues to haunt the Jacobses.

95.    Moreover, Defendants stole Plaintiff Jacobs' first camera given to him by his father from World War II, stole a box of negatives that contained his irreplaceable first images photographed as a teenager, and tools that were used by his father pre-World War II.

96.    In support, the *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 856 (10th Cir. 2005) court held "the "recklessness" element of a claim for intentional infliction of emotional distress "includes actions that are in deliberate disregard of a high degree of probability that the emotional distress will follow" (internal quotation marks omitted)."

97.    Pain and suffering damages not only include what has already happened but will likely happen in the future because of the injury.  Through the breach of contract, and the violation in the Plaintiffs' residence and on their personal effects, there will also be future pain and suffering as that the Plaintiffs copes with the everyday difficulties. "Recovery may be had for future pain and suffering if the evidence shows that it is "reasonably certain to be experienced

in the future as a result of the injury."" *Rael v. F & S Co.*, 94 N.M. 507, 515 (N.M. Ct. App. 1980).

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### Breach of Contract *Per Se*

98.    Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this claim against all Defendants.

99.    Plaintiffs allege Breach of Contract under NM Stat § 37-1-3 (2021).  Plaintiffs claim that Clark and Carroll's breach was willful, intentional and in disregard of Plaintiffs' rights. Moreover, the Accomplice Defendants were bound as "associated parties" by the NCNDA and using the residence as a domicile.

100.    WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and any attorney fees.

### SECOND CAUSE OF ACTION
#### Theft of Firearms and Conversion as a Tort

101.    Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this claim against Clark and Carroll for the intentional theft of three firearms.

102.    Plaintiffs allege that Clark stole the three firearms belonging to Plaintiff Handler Jacobs from the residence in violation of 18 U.S.C. § 922.  Plaintiffs further allege that Clark and Carroll transported said firearms between four States and 11 counties. Plaintiffs claim that the Defendants' infringement was willful, intentional and in disregard of Plaintiff Handler Jacobs' rights.

103.  WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants for firearm theft, in compensation of the direct and consequential economic and non-economic damages Plaintiff Handler Jacobs has suffered, as well as punitive damages, cost of suit and any attorney fees.

### THIRD CAUSE OF ACTION
### Civil Conspiracy as a Result of Contract Breach

104.  Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this claim against all Defendants.

105.  Plaintiffs allege civil conspiracy under NM Stat § 30-28-2 (2021) against all Defendants.  All Defendants did conspire to steal Plaintiffs' personal chattel and deprived the Jacobses of same, as outlined hereinabove and by exhibits.

106.  WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants for trespassing on Plaintiff's real property, in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive and statutory damages, cost of suit and any attorney fees.

### FOURTH CAUSE OF ACTION
### Aiding and Abetting with Contract Interference

107.  Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this claim against all Defendants.

108.  Black's Law Dictionary, 2nd Ed. defines aiding and abetting as consisting in being present at the time and place and doing some act to render aid to the actual perpetrator of the crime, though without taking a direct share in its commission. See 4 Bl. Comm. 34; *People v. Dole*, 122 Cal. 486, 55 Pac. 5S1, 68 Am. St. Rep. 50; *State v. Tally*, 102 Ala. 25, 15 South. 722; *State v. Jones*, 115 Iowa, 113, 88 N. W. 196; *State v. Cox*, 65 Mo. 29, 33.

109.  Tortious interference is a common law tort allowing a claim for damages against a defendant who wrongfully interferes with the plaintiff's contractual or business relationships. *See https://www.law.cornell.edu/wex/tortious_interference.*

110.  WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants interference of the NDNCA in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and any attorney fees.

**FIFTH CAUSE OF ACTION**
**Intentional Tort of Trespass on Property in Breach of Contract**

111.  Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this claim against Carroll, Clark and all Accomplice Defendants.

112.  Plaintiffs allege that Accomplice Defendants did knowingly and willfully trespass upon Plaintiffs' "Private Property: No Trespassing" posted Property after December 15, 2016, without any written permission in violation of NM Statute § 30-14-1(A) and as a direct and intentional act. Plaintiffs further allege that Clark and Carroll allowed members of the press to trespass on the Property without any written permission of the Plaintiffs as owners.

113.  WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against Clark and Carroll and the Accomplice Defendants for trespassing on Plaintiffs' real Property, in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and any attorney fees.

## SIXTH CAUSE OF ACTION
### Intentional Tort of Continuing Trespass of Chattel Per Se

114.  Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this claim against all Defendants.

115.  Plaintiffs allege that on or after December 15, 2016, the House Sitters began to indiscriminately trespass upon Plaintiff's chattel by moving into Plaintiffs' master bedroom and removing the Jacobses belonging.  Plaintiffs aver that Defendants removed unknown amounts of Plaintiffs' chattel from the Property by the time they vacated, including the missing USMS badge (Exh. 14, image #2) and other unknown items (*See* Exh. 10).  The House Sitters and Accomplice Defendants have continually deprived Plaintiffs of possession or control of their chattel as of this filing.

116.  Plaintiffs further allege that all Defendants' conduct is so outrageous in character and so extreme in degree, that a reasonable member of the community would regard the conduct as atrocious.

117.  WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants for trespassing on Plaintiff's chattel, in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and any attorney fees.

## SEVENTH CAUSE OF ACTION
### Intentional Tort of Continuing Conversion

118.  Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this claim against all Defendants in violation of  NM Stat § 37-1-7 (2021). The "conversion" occurs once the defendant uses the personal property or money for purposes that violate the original agreement and for their own personal gain.

119.   Plaintiffs have proven herein that the Defendants have engaged in unauthorized acts which deprived the Jacobses of their property permanently and have established that Plaintiffs had a right to possession of their property and demand its return. Plaintiffs have sent letters to some Defendants without a reply.

120.   WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and any attorney fees.

## EIGHTH CAUSE OF ACTION
### Intentional Tort of Continuing Grand Larceny

121.   Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this claim against all Defendants in violation of N.M. Stat. Ann. Section 30-16-1. Simply put, this section states that larceny consists of stealing anything of value that belongs to another.

122.   In the leading case, _United States v. Turley_, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957), the Supreme Court construed the term "stolen" in the National Motor Vehicle Theft (Dyer) Act, 18 U.S.C. § 2312. The Court held that the meaning of the federal statute should not depend on state law definitions of larceny. _Id._ at 411, 77 S.Ct. at 399. It noted that "stolen" had no common law meaning and held that the term included "all felonious takings. . . with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." _Id._ at 417, 77 S.Ct. at 402.

123.   Plaintiffs allege that all Defendants vacated the Property with personal chattel of the Jacobses with willful acts to permanently deprive them of same. Therefore, as a continuing tort, each day that the chattel is away from Plaintiffs resets the accrual date.

124.   WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against

the Defendants in compensation of the direct and consequential economic and non-economic

damages they have suffered, as well as punitive damages, cost of suit and any attorney fees.

## NINTH CAUSE OF ACTION
### Tort of Negligence *Per Se* as a Result of Breached Contract

125.   Plaintiffs incorporate by reference all of the preceding paragraphs and allegations

therein as if fully set forth herein and brings this claim against all Defendants for violations as

found in NMSA § 41-4-1 et seq as a matter of law.

126.   To proceed with a negligence lawsuit in New Mexico, Plaintiffs must prove four

elements[14]. The first is the existence of a duty of care. This is usually defined as an obligation,

such as the NDNCA to act in a reasonable manner.  It also must be shown that there was a

breach of the duty, and that the Plaintiffs' harm was caused by the breach. The causation element

requires showing both that the injuries were a direct result of the defendant's careless conduct

and that they were reasonably foreseeable. Finally, the Plaintiffs must identify quantifiable

damages that stemmed from the harm.  All of these elements have been met hereinabove.

127.   New Mexico courts have indicated that a tort plaintiff must demonstrate there is

"a chain of causation initiated by some negligent act or omission of the defendant, which in legal

terms is the cause in fact or the `but for' cause of plaintiffs injury." *Chamberland v. Roswell*

*Osteopathic Clinic, Inc.*, 130 N.M. 532, 27 P.3d 1019, 1023 (N.M.Ct.App. 2001)

128.   Here, the House sitters were contracted to safeguard the Property in Plaintiffs'

absence. This is a "but-for causation, i.e., without the fault of the defendant, the harm would not

have occurred" *Menne v. Celotex Corp.*, 861 F.2d 1453, 1460 n.8 (10th Cir. 1989) citing *Borland*

*v. Gillespie*, 206 Neb. 191, 292 N.W.2d 26, 29 (1980) and *Daniels v. Andersen*, 195 Neb. 95, 237

---

[14] *See Coleman v. Eddy Potash, Inc.*, 120 N.M. 645,650, 905 P.2d 185, 190 (1995); See also *Tafoya v. Seay Bros.*, 119 N.M. 350, 352, 890 P.2d 803, 805 (1995); W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 30 at 143 (1971); Nunley, supra note 2, at 119.

N.W.2d 397, 402 (1975). The House Sitters failed their duty of care to protect and prevent damage to Plaintiffs Property. Thr House Sitters began their malfeasance by forging checks, discarding and selling the Jacobs' chattel and allowing Accomplice Defendants to "rent" spaces in the residence which is against the occupancy laws. Thereafter, the Accomplice Defendants followed suit by joining the negligence of the House Sitters in violating the Plaintiffs' Property and chattel. All Defendants, but not limited to, creating damage to the residence, stealing and discarding Plaintiffs' chattel, and invaded Plaintiffs' private affairs including documents, mail and abused the cats, etc.

129. Plaintiffs further allege that Defendants' conduct is so outrageous in character (as described hereinabove), and so extreme in degree, that a reasonable member of the community would regard the conduct as atrocious.

130. WHEREFORE, Plaintiff respectfully request this Court enter a judgment against the Defendants in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and any attorney fees.

## TENTH CAUSE OF ACTION
### Intentional Tort of Cruelty to Animals

131. Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this claim against all Defendants for violation of NMSA 30-18-1(E).

132. The House Sitters were in charge of caring for Plaintiffs' three beloved cats which were missing when Plaintiff Handler Jacobs arrived back at the residence. The entire house was littered with dog feces and urine, especially on the carpeting. Defendant Clark adopted a black Labrador puppy as confirmed by Animal Humane New Mexico and brought it into the residence without permission from the Plaintiffs. Plaintiffs found evidence that Defendant Jones also had a

dog on the Property without permission to be in the residence at all.

133. Plaintiff Handler Jacobs also found evidence in the form of burial mounds in the backyard laced with lime with remains that were consistence with the cats. Plaintiffs aver that the Defendants starved the cats to death even though Plaintiff Handler Jacobs had cat food regularly shipped to the Property.

134. Plaintiffs further allege that Defendants' conduct is so outrageous in character (as described hereinabove), and so extreme in degree, that a reasonable member of the community would regard the conduct as atrocious.

135. WHEREFORE, Plaintiff respectfully request this Court enter a judgment against the Defendants in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and any attorney fees.

## ELEVENTH CAUSE OF ACTION
### Invasion of Privacy

136. Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this claim against all Defendants.

137. Plaintiffs allege that Defendants violated their privacy when they caused the invasion of Plaintiffs' private affairs and activities as a result of trespass, and in a manner that is so objectively unreasonable as to offend or embarrass an ordinarily prudent person. Defendant Carroll also misrepresented Plaintiffs in a way that placed them in a false light. Plaintiffs assert that Carroll allowed the Albuquerque Journal to steal the Cannes photograph (Exh. 14, image #1) allowing for as much negative imagery as possible. Carroll acted with reckless disregard as to the falsity and misleading nature of the published derogatory material satisfying Restatement (Second) of Torts § 652E.

138. Plaintiffs further allege that Defendants' conduct is so outrageous in character (as

described hereinabove), and so extreme in degree, that a reasonable member of the community would regard the conduct as atrocious, going beyond all possible bounds of decency and utterly intolerable in a civilized community with intentionally or recklessly made statements that created a high degree of risk of harm, yet deliberately proceeded to act with conscious disregard or indifference to the risk.

139.   WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and any attorney fees.

## TWELFTH CAUSE OF ACTION
### Vandalism as a Result of the Breached Contract

140.   Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this claim against all Defendants in violation of NM Stat § 30-15-1 (2021).

141.   Upon information and belief as described hereinabove and as a matter of law, Plaintiffs claim this Cause against Defendants, having acted in furtherance of wrongful conduct aimed at Plaintiffs, and have vandalized Plaintiffs' property by damaging the interior of the residence.

142.   "The ancient connotations of 'vandalism' have given way, in modern usage of the term, to a very broad meaning of the word that includes the destruction of property generally." _Battishill v. Farmers Alliance Insurance Co._, 127 P.3d 1111, 1114 (N.M. 2006) (internal quotation marks omitted). See also _Azar_, 119 S.E.2d at 84. _Kimball v. Nationwide Ins. Co._, Civil Action 21-cv-02201-REB-SKC, at *12 n.15 (D. Colo. Apr. 11, 2023)

143.   Plaintiffs allege that the House Sitters did engage in vandalism by first cutting bedroom doors in half and then punching holes in the walls as found by Plaintiff Handler Jacobs

upon her return.  She also found fist size holes in other doors and the carpeting barely usable and filthy.  The carpets were cover with dog feces and urine as well as bleach marks from meager attempts at cleaning up unknown substances. She also found art pieces damaged such as an antique room divider torn apart.  More evidence to be provided at trial.

144.  Plaintiffs further allege that Defendants' conduct is so outrageous in character (as described hereinabove), and so extreme in degree, that a reasonable member of the community would regard the conduct as atrocious.

**145.**  WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants in special compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and any attorney fees.

## THIRTEENTH CAUSE OF ACTION
### Forgery and Identity Theft

146.  Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this claim against Defendant Carroll.

147.  Plaintiffs allege that Carroll did willfully and with malice, forged Plaintiff Handler Jacobs' signature on 23 checks for unjust enrichment. Further Carroll impersonated Plaintiff Handler Jacobs at several check cashing facilities.

148.  Plaintiffs further allege that Defendants' conduct is so outrageous in character (as described hereinabove), and so extreme in degree, that a reasonable member of the community would regard the conduct as atrocious.

149.  WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against the Defendants in special compensation of the direct and consequential economic and non-economic damages they suffered, as well as punitive damages, suit cost and any attorney fees.

40

## FOURTEENTH CAUSE OF ACTION
**Intentional Infliction of Emotional Distress Tort**

150.  Plaintiffs incorporate by reference all of the preceding paragraphs and allegations therein as if fully set forth herein and brings this claim against all Defendants.

151.  Plaintiffs are senior citizens and have suffered elder abuse by both Clark and Carroll in their home.  Plaintiff Jacobs, who is 100% disabled veteran with high blood pressure and diabetes, alleges that he continues to suffer severe emotional distress daily because of Defendants' extreme and egregious conduct. Plaintiff Handler Jacobs is a Leukemia patient and also continues to suffer severe emotional distress daily which has inexcusably affected her condition.  Plaintiffs further allege that Defendants' conduct is so outrageous in character (as described hereinabove), and so extreme in degree, that a reasonable member of the community would regard the conduct as atrocious, going beyond all possible bounds of decency and utterly intolerable in a civilized community with intentionally or recklessly made statements that created a high degree of risk of harm, yet deliberately proceeded to act with conscious disregard and indifference to the risk.

152.  Plaintiffs have continually suffered substantial injury as a result of the breach of contract resulting in trespass, larceny, death of their beloved pets, invasion of privacy, including but not limited to, injury to character and reputation, mental anguish, loss of past and future income and loss of earning capacity.  Plaintiffs have suffered direct and irreparable personal and economic injury.

153.  WHEREFORE. Plaintiffs respectfully request this Court enter a judgment against the Defendants in compensation of the direct and consequential economic and non-economic damages they have suffered, as well as punitive damages, cost of suit and any attorney fees.

VII.   **CONCLUSION**

154.  Plaintiffs allege that Defendants' conduct is so outrageous in character (as described hereinabove), and so extreme in degree, that a reasonable member of the community would regard the conduct as atrocious, going beyond all possible bounds of decency and utterly intolerable in a civilized community with intentionally or recklessly made statements that created a high degree of risk of harm, yet deliberately proceeded to act with conscious disregard and indifference to the risk.

VIII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully submits this prayer for relief per Federal Rules of Civil Procedure 8(a)(3) against each and every Defendant:

A.   that the Court orders the return of any of Plaintiffs' chattel remaining in all Defendants' possession including tools, jewelry, furs, family silver, etc., taken from the Property (*See* Exh. 10);

B.   that the Court orders Defendants to return each and every photographic image that had been stolen, kept, or been given away;

C.   that the Court order Defendants to provide Plaintiffs with an accounting of income as a result of the usage and sale of Plaintiff Jacobs' images;

D.   that the Court order Defendants, to the best of the Defendants' recollection, what items of Plaintiffs' that they sold at the garage sales, for approximately how much, and any contact information to whom these items were sold;

E.   that the Court order Clark and Carroll provide an accounting of all "rent" monies collected by them from the Accomplice Defendants and any other Does;

F.   that the Court award to Plaintiffs punitive, compensatory (commensurate with the magnitude of theft and for a deterrent) exemplary and special damages of not less than $3,000,000.00 and to be determined at trial;

G.   that the Court order Carroll to provide a letter to Plaintiffs as a written retraction of the false statements she communicated to the *Albuquerque Journal*;

H.   that the Court award to Plaintiffs $2,526,692.00 in actual damage for stolen chattel;

I.      that the Court award to Plaintiffs $45,000.00 in actual "disaster" cleaning charges, repairs and to replace the heavily damaged (bleached) carpeting at the Property;

J.      that the Court award to Plaintiffs wage garnishment against all Defendants jointly and severally;

K.      that the Court order liens on any and all property owned by any Defendants;

L.      that the Court review the MJ Photo Collection certified American Society of Appraisers ("ASA") appraisal[15] and award[16] to Plaintiffs a compensatory amount in damages for the stolen photographs (*See* Exh. 21);

M.      award all costs of this action, including any attorneys' fee and court costs, to Plaintiffs; and

N.      such other and further relief as this Court deems just and proper.

## IX.      **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues so triable.

## X.      **RESERVATION OF RIGHTS**

Plaintiffs reserve the right to amend this Complaint as new information becomes

available to Plaintiff.

Respectfully submitted this 28th day of November 2023.

By: _____
Michael Jacobs
*Pro Se Plaintiff*
800 Calle Divina NE
Albuquerque, NM 87113
Tel: (505) 321-3044
michael.mjphoto@gmail.com

By: _____
Ruby Handler Jacobs
*Pro Se Plaintiff*
800 Calle Divina NE
Albuquerque, NM 87113
Tel: (505) 321-3055
rubyhandler@gmail.com

---

[15] Plaintiff Jacobs would provide the full appraisal for in camera review upon request of the Court.

[16] The Plaintiffs are well aware that the $640,000,353.59 appraised amount of the theft of Plaintiff Jacobs' copyrighted photographs is highly unlikely to be fully compensated to Plaintiffs by these Defendants. Therefore, Plaintiffs suggests that the jury provide an appropriate number for these damages.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MICHAEL JACOBS and
RUBY HANDLER JACOBS

      Plaintiffs,

      vs.                                      Case. no. _____

BRANDON DEWAYNE CLARK a/k/a BRANDON
P. CLARK; MELLISSA MICHELLE CARROLL
a/k/a MELISSA M. ZAWISTOSKI; AMANDA
CARROLL a/k/a AMANDA CAROLE; WILLIAM
MICHAEL JONES; GENIENNE CONAWAY
RIGGLE; CANDIE RENEE SWAN; ASHTON
SWAN; RENEE ANDREA KEXEL; JEREMY R.
STONE; GERALD R. STONE; RUTH A. CHIODA
a/k/a RUTH HELDRETH; and DOES 1 THROUGH
20; INDIVIDUALLY OR JOINTLY and
SEVERALLY.

      Defendants.

## EXHIBIT LIST FOR BRANDON DEWAYNE CLARK *ET AL* COMPLAINT

| Exhibit | Item/Document Description | Date | Pages |
|---|---|---|---|
| 01 | Signed NDNCA | 10/03/13 | 03 |
| 02 | Clark email about Carroll to Plaintiffs | 10/30/13 | 01 |
| 03 | Ruby Handler Jacobs Notarized Affidavit | 01/19/18 | 04 |
| 04 | Carroll Father's Day greeting to Plaintiff Jacobs | 06/20/15 | 01 |
| 05 | No Trespassing Sign - yard | 08/12/11 | 01 |
| 06 | APD report 2/15/17; supplements: 8/4/17; 12/5/17, 03/09/18 | 06/15/18 | 15 |
| 07 | Photos of debris at the Property | Dec 2017 | 01 |
| 08 | Package to Albuquerque Mayor, Chief Administration Officer | 05/26/21 | 17 |
| 09 | Theft one sheet – initial items of urgency | 12/05/17 | 01 |
| 10 | Master Summary List and List of Missing Items | 03/09/18 | 29 |
| 11 | Clark Affidavit | 02/21/14 | 01 |
| 12 | A.Carroll (a/k/a Carole) mailed to the Property | 04/18/19 | 01 |
| 13 | Jones bank statement with "Fire & Ice  Auto Repair" at Property | 04/01/17 | 01 |
| 14 | Zuma photos | 06/24/21 | 01 |
| 15 | Clark family change of address by the U.S. Postal Service | 11/26/17 | 01 |
| 16 | Jones rental agreement for furniture moved to Property (4 persons) | 04/03/17 | 01 |

| 17 | Swan USPS change of address for the Swan family to Property | 05/24/17 | 01 |
| 18 | Reece Kexel (son) delivered mail correctly to the Property | 06/15/18 | 01 |
| 19 | J.Stone junk mail delivered to the Property | | 01 |
| 20 | Office sign - Private | 09/01/19 | 01 |
| 21 | Appraiser clarification of Plaintiff Jacobs' photo library | 02/15/08 | 01 |
| 22 | Attorney General of New Mexico complaint | 10/21/20 | 04 |
| 23 | Additional information | 06/14/18 | 03 |

Respectfully submitted this 28th day of November 2023.


By: _____
Michael Jacobs
*Pro Se Plaintiff*
800 Calle Divina NE
Albuquerque, NM 87113
Tel: (505) 321-3044
michael.mjphoto@gmail.com

By: _____
Ruby Handler Jacobs
*Pro Se Plaintiff*
800 Calle Divina NE
Albuquerque, NM 87113
Tel: (505) 321-3055
rubyhandler@gmail.com

# NO STONE UNTURNED

## SECURITY & INVESTIGATIVE SERVICES

California PPO # 14340   •   New Mexico PPO # 2020

### MUTUAL NON-DISCLOSURE, NON-CIRCUMVENTION
### AND CONFIDENTIALITY AGREEMENT

This Non-Disclosure, Non-Circumvention and Confidentiality Agreement ("**Agreement**") is by and between *Brandon Clark and any other associated Parties* ("Agent"), a *house sitter in exchange for housing (from Cal(Imp)Security)* and NO STONE UNTURNED SECURITY & INVESTIGATIVE SERVICES ("NSU"), a New Mexico limited liability company. Collectively NC and COMPANY are hereinafter known as the "Parties" and singularly as the "Party."

**WHEREAS**, each party owns or otherwise has legal rights to Confidential Information (as defined below); and

**WHEREAS**, each party wishes to share their Confidential Information in private with the other party for the limited Purpose defined below, such that each party may alternately be a discloser of Confidential Information (a "**Discloser**") or be a recipient of the other party's Confidential Information (a "**Recipient**"); and

**WHEREAS**, the Parties wish to define the manner in which Confidential Information is to be provided, the extent to which Confidential Information may be used by a Recipient, and the obligations a Recipient has to protect such confidentiality.

**NOW, THEREFORE**, incorporating the above, the Parties, intend to be legally bound and do hereby agree as follows:

1. **Definition of Confidential Information.** "**Confidential Information**" under this Agreement means any oral and/or written non-public, confidential, proprietary, and/or secret information, including: trade secrets; ideas; business concepts, discoveries or inventions; graphic, demonstrative, samples, flow charts, products, logos, names or other information in machine recognizable form; specifications, patterns, or techniques; formulas, computations, or software and computer programs; devices, processes, or operation methods; products or equipment, or new product developments, plans or improvements; technical information, insights, and know-how; customer and client information or lists; financial information or statements; sales or marketing information, plans, projections, or strategies; personnel information or new personnel acquisition plans; pricing policies; business relationships; business acquisition plans; and any discussions, negotiations and proposals between the Parties under this Agreement.

2. **Scope of Protection.** Confidential Information that is protected under this Agreement includes: (i) tangible information (such as written materials, models and specimens) identified as being Confidential Information by an appropriate, conspicuous legend (such as "**Restricted**" or "**Confidential**"); (ii) information in oral or visual form that is identified as being Confidential Information at the time of disclosure and confirmed in writing as Confidential Information within 30 days after the disclosure; or (iii) information that, given the nature of the information or the circumstances surrounding its disclosure, reasonably should be considered as Confidential Information. In addition, if a party is on the premises of the other party to this Agreement and inadvertently receives information not related to this Agreement that a reasonable person would discern to be confidential to that other party, that information shall be treated as Confidential Information under this Agreement.

3. **Ownership of Confidential Information.** In no way does this Agreement provide the Recipient any ownership rights or other rights of claim (including intellectual property rights) to the Discloser's Confidential Information, or its derivatives. Nothing herein shall be construed as giving the Recipient any license to, or other rights with respect to, any patent heretofore or hereafter issued to the Discloser. This Agreement does not obligate either party to disclose any Confidential Information to the other, or to enter into any subsequent transaction with the other party.

4. **Purposes and Use.** Each party agrees to use the Confidential Information received hereunder only for



**Exhibit 1**

Recipient to prevent the unauthorized use or disclosure of Confidential Information; (ii) seek direct, consequential, indirect, or punitive damages, and that such damage calculations may include lost potential profits or cost savings; and (iii) seek all other available legal and equitable remedies. The Parties agree that all legal and equitable rights, remedies and damages available to the Discloser shall be considered cumulative and the use or choice of a particular remedy, damages or relief shall not preclude the Discloser's further exercise of other rights, remedies and damages. The Discloser will have no liability to the Recipient resulting from any use of the Confidential Information by the Recipient.

10. **Contract Execution.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same document. This agreement is considered executed by any party upon manual signature of an authorized representative of that party on any counterpart, including on a photocopy or facsimile of a counterpart. Delivery by facsimile of an executed counterpart by any party to another shall have the same force and effect as a delivery in person of that document.

11. **Term.** This Agreement shall be effective and binding upon all Parties hereto as of the latest date when all Parties have first executed any counterpart of this agreement (the "**Effective Date**"). The Term of this Agreement begins on the Effective Date and continues for a period of five (5) years.

12. **Miscellaneous.** This Agreement and the rights of the Parties hereunder are governed by the laws of the State of New Mexico. This Agreement may be modified only if such change is mutually agreed upon in a writing signed by the Parties. This Agreement expresses the sole and entire Agreement between the Parties in this matter and supersedes all prior discussions, representations and understandings in this matter. If any court determines that any provision of this agreement is invalid or unenforceable, any invalidity or unenforceability will affect only that provision and will not make any other provision of this agreement invalid or unenforceable.

13. **Non-Solicitation.** The Parties hereby confirms that neither NC nor anyone on its behalf, or anyone else, has solicited in anyway, nor any document received or that will be received shall be deemed to be a solicitation. Additionally, the Parties confirms that there has not been any offer to buy or sell securities and that this or any other document from NC is not intended to be an offer to buy or sell securities.

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement by their authorized representatives.

Company:                                    Company: NORTHERN CORRIDOR, LLC

Signature: By _____           Signature: By _____

Printed Name: _____            Printed Name: Michael Jacobs
Date: _____             Date: 11 October 2011

Address for notices:

                                            Signature: By _Ruby Handler Jacobs_
                                            Printed Name: Ruby Handler Jacobs
Email:                                      Date: 11 October 2011
Attention:
                                            Address for notices:

                                            P.O. Box 91537
                                            Albuquerque, New Mexico 87199   USA
                                            Email: michael@RioGrandeStudios.com
                                            Attention: Michael Jacobs or Ruby Handler Jacobs

---

*Please note:*
If this counter-signed Agreement isn't received within 3 business days, your project submission may be rejected. Thank you

*Please scan and email to:* **michael.mjphoto@gmail.com**      *Thank you.*



 Gmail

Michael J. Jacobs <michael.mjphoto@gmail.com>

## Re:

**Brandon Clark** <clarkbrandon19@gmail.com>          Wed, Oct 30, 2013 at 9:49 AM
**To:** Michael Jacobs <michael.mjphoto@gmail.com>

Good after noon Jacobs. This is Brandon. I am writing via email. It'll be easier than text at this point. I have the paperwork for Leon filled out. Told him it will be a little while before we pay him . paperwork had to be put in the computer......
Haven't gotten money from bill yet. Wasn't gonna play chase with him. Anyway hope all is going good where you are.
    On personal note. I'm OK so far hehehe. I wanted to talk to you about Melissa. I know you don't know her from Adam. But if she does get kicked out of her program due to her work schedule. I was wondering if it will be OK for her to stay with me. If not that's OK. I won't do anything with our talking to you and getting your permission first.. Your cats are good sassy as possible lol. I can tell they miss you. OK well I'll talk to you later if you need anything plz let me know...

**Exhibit 2**

## Affidavit

I, Ruby Jacobs, do so swear under penalty of perjury, the following:

1. I am the co-owner of the property premises at 800 Calle Divina NE. Albuquerque, NM 87113. We had t his home built, starting in 2003 and completed in March of 2004.

2. **Brandon Dewayne Clark (SS#** ▮▮▮**-1745) & then additionally, Melissa Carroll (SS#** ▮▮▮**-9092),** had resided at this premises for approximately 3 ½ years, with the signed agreement that they be caretakers, pet sitters & plant sitters when my husband and/or myself are out of town. *Brandon Dewayne Clark – NM Dr. Lic. # 512932576*

3. They were allowed to reside in a 2 bedroom, 1 bathroom suite upstairs.

4. Brandon impregnated Melissa and she gave birth to Michael Dewayne Clark (Birthdate 8-17- 2014).

5. Melissa also had a daughter, Samantha, (Birthdate April 8, 2010), who also resided some at the home. Her father is named Wesley Clark and has, to my knowledge, gotten more custody of Samantha more recently. Melissa had too many tardies and thus was not responsible. (evidence also included for the tardies)

6. Prior to this agreement with them, they were homeless, had no vehicles nor employment.

7. Brandon clark was recommended to me by another woman who ran a security company out of Gallop, NM, Mavis Price, as someone who was "reliable."

8. They were not to touch, steal, sell, destroy, discarded any of our belongings.

9. They received mail at our mailbox, but were specifically instructed and agreed not to touch, open, handle, etc. any of our mail. It was to be kept for us for our return.

10. They were allowed to only use our kitchen, appliances, etc. for their own use.

11. Upon my return this time on Nov. 22, 2017, I was told by our family attorney, Mr. Peter Staiti, that they had gotten a dog, against our agreement, and Mr. Staiti had told me that they had been acting suspiciously as of recent, and had been refusing to allow him into the house.

12. It was later found out that Brandon Clark got a black labrador "puppy" at a local shelter, which has agreed to provide this detail of fact upon law enforcement request.

13. When Mr. Staiti informed the above individuals that I was returning soon, he also told them they we had found out about Melissa forging company checks and therefore stealing funds out of one of our bank accounts, in the amount of $10,230.74.

14. It was later discovered that Melissa, after Mr. Stati discovered missing money and had the bank account frozen, went around to various check cashing places in Albuquerque, and was able to cash company checks, further defaming the company, and steal approximately another $2,639.16, by "self verifying" the checks saying that she was the owner of the company or that she "ran the company."

15. Mr. Stati then informed me that they had left the premises.

**Exhibit 3**

32. There is evidence in t he fireplace and other partially burned photographs, that they were burning many of our papers, photographs and other affects.

33. There were several garbage bags left on the property that contained other items of ours that they were throwing away.

34. They have stolen or destroyed business records, company records & company equipment.

35. They have stolen destroyed or discarded all of our mail & allowed other persons to reside in the house and use it as their mailing addresses.  This has been filed with the Postal Inspector, case # CA135877565.

36. They have stolen prescription drugs & other medications & prescribed vitamins & other natural products.

37. Brandon has stolen 3 company **guns**.  Since they also stole, destroyed or burned all company records, any gun registrations were also missing. However one gun case was found with the following registration number, that was registered to Ruby Jacobs. # RIA1846199

38. Brandon and Melissa also stole **U.S. Marshal Badges** from Ruby Jacobs.

39. There is evidence of drug use in our home.

40. I have filed an animal abuse report with the city at 311.

41. Melissa Carroll forged my signature on company checks and thus stole over $10,000. cash from a company bank account. Additionally approximately $2,600 was cashed by Melissa Carroll of forged company checks which she cashed at check cashing places around town. A Police report was filed & the attached list is also being added to that theft report.

42. There was also approximately $3,400.00 cash for a weeks payroll, that Brandon & Melissa stole that had been in Ruby's Master Bedroom Closet.

43. On Jan.3, 2017, there was evidence that Brandon & Melissa opend a personal joint Wells Fargo Bank account.  They had no bank accounts prior to this. It is believed they opened this account with stolen funds intended for the company payroll.

44. There is evidence that Brandon Clark & Melissa Carroll and William Jones were filing for various types of public assistance and falsely reporting income, while grossly stealing funds from us and our company.

45. There is much evidence that they were living "high on the hog" so to speak, with buying expensive electronics, a pool, food items, etc. with our stolen funds.

46. Brandon & Melissa left their son, Michael's, birth certificate in our home, with a note on it stating their acknowledgement, that "all they need to do is show this to get more foods stamps!"

47. Brandon and Melissa left mail in our home of a confirmation of mail forwarding addresses for both Mr. Clark & Ms. Carroll to the following Post Office: Rio Salada at 1441 E. Buckeye Rd., Phoenix, AZ 85034-4128 (attached)

48.  **Thus this case is now also Federal and they have crossed state lines with stolen goods and with stolen firearms.**

49.  There are 2 Traffic violations by Brandon Dewayne Clark, on Nov. 2 & Nov. 10, 2017 displaying another vehicle that he acquired (most likely with our stolen funds), NM License plate # WL0962, a 2000 Hyundai, 4 door automatic, (attached)

50. A letter from the Bank of New Mexico to Mr. Clark, informing him that his bank account is overdrawn. (attached)

Gmail - Melissa Carroll posted on your timeline                                           11/24/23, 10:30 PM

 Gmail

## Melissa Carroll posted on your timeline

**Facebook** <notification+oocl6pg1@facebookmail.com>                    Sat, Jun 20, 2015 at 11:56 PM
Reply-To: Reply to Comment
<e+0oacylt000000bborj902ryxan1b6za000000000000000000000002xs1i@reply.facebook.com>
To: Michael Jacobs <michael.mjphoto@gmail.com>

   Facebook

**Melissa Carroll** posted on your timeline

   **Melissa Carroll**
June 20 at 10:56pm

happy fathers day!! thank you for always being there for me i may not have my dad but
you are def a father figure to me. Thank you for your words of encouragement and
wisdom and knowledge and understanding of being there. The kids adore you and we
may not say it often but we all love you! have a wonderful day tomorrow 😊 ☺

☐ **Like**      ☐ **Comment**

[ View Post ]

Reply to this email to comment on this post

michael.mjphoto@gmail.com

unsubscribe

**Exhibit
4**

08/12/2011

**NO TRESPASSING** sign on the front yard of 800 Calle Divina NE



Created 08/12/11

**Exhibit**
**5**



JACOBS EX.
**H**

# STATE OF NEW MEXICO
# UNIFORM INCIDENT REPORT

| OCCURRENCE DATE(S) | | | DATE REPORTED | ORI NO NM 0010100 | CASE NO 170074964 | PAGE 1 | OF 1 |
|---|---|---|---|---|---|---|---|

| ON | OR | BETWEEN | | AGENCY/COUNTY ALBUQUERQUE POLICE DEPARTMENT | DISTRICT NO 134 | INCIDENT NO 172160811 | |
|---|---|---|---|---|---|---|---|
| MM/DD/YYYY 02-15-2017 | MM/DD/YYYY 03-30-2017 | MM/DD/YYYY 08-04-2017 | | | | | NO OF UNITS INV 88 |

| TIME 1200 | DAY OF WEEK WED | TIME 1200 | DAY OF WEEK THU | TIME 1400 | DAY OF WEEK FRI | ADDRESS/LOCATION OF INCIDENT 10800 FRAZIER LN SW | CITY ALBUQUERQUE | ZIP 87121 | |
|---|---|---|---|---|---|---|---|---|---|

## OFFENSE

| | OFFENSE / INCIDENT | STATUTE OR ORDINANCE | FEL M/SD | ATTEMPTED | COMPLETED | UCR OFFENSE CODE | CRIMINAL ACTIVITY CODE | LOCAT CODE | WEAPON CODE | OFFENSES/BUSINESSES |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Fraud-Over $2500/Less $20000   2699 | 30-16-6E | F | | | 26A | | 20 | 99 | |
| 2 | | | | | | | | | | |
| 3 | | | | | | | | | | |

## SUBJECTS (VICTIMS / SUSPECTS / PERSONS / BUSINESSES)

| PERSON CODE | CODE TYPE | | 1-NAME (LAST, FIRST, MIDDLE) | | SOCIAL SECURITY NO | DOB 1942 | AGE (RANGE) 75 | SEX M | RACE W |
|---|---|---|---|---|---|---|---|---|---|
| REP | I | N | Staiti   Peter   F | | | | | | |

| STREET ADDRESS 10800 FRAZIER LN SW | APT NO | RES PHONE (505) 503-6344 | HEIGHT 5'09" | WEIGHT 190 | HAIR WHI | EYES HAZ | ETHNICITY N | |
|---|---|---|---|---|---|---|---|---|

| CITY ALBUQUERQUE | STATE NM | ZIP 87121 | BUS PHONE | | | | |
|---|---|---|---|---|---|---|---|

| EMAIL | EMPLOYER/SCHOOL AND ADDRESS | | SUSPECT OF OFFENSE NO | ARRESTED FOR OFFENSE NO | GANG AFFILIATION |
|---|---|---|---|---|---|

| ALIAS / NICKNAME | MARKS/SCARS/TATTOOS | CLOTHING DESCRIPTION | ARMED WITH WEAPON CODE |
|---|---|---|---|

| DRIVER'S LICENSE NO | D.L. STATE NM | ARREST/CITATION NO | F.B.I NO | S.I.D NO | NIC NO | RES STATUS R |
|---|---|---|---|---|---|---|

| PERSON CODE SUS | CODE I | TYPE N | 2-NAME (LAST, FIRST, MIDDLE) Carroll   Melissa | SOCIAL SECURITY NO | DOB | AGE (RANGE) 35 - 45 | SEX F | RACE W |
|---|---|---|---|---|---|---|---|---|

| STREET ADDRESS 800 Calle Divina NE | APT NO | RES PHONE (505) 463-3588 | HEIGHT | WEIGHT | HAIR | EYES | ETHNICITY N | |
|---|---|---|---|---|---|---|---|---|

| CITY ALBUQUERQUE | STATE NM | ZIP 87113 | BUS PHONE | | | | |
|---|---|---|---|---|---|---|---|

| EMAIL | EMPLOYER/SCHOOL AND ADDRESS | | SUSPECT OF OFFENSE NO | ARRESTED FOR OFFENSE NO | GANG AFFILIATION |
|---|---|---|---|---|---|

| ALIAS / NICKNAME | MARKS/SCARS/TATTOOS | CLOTHING DESCRIPTION | ARMED WITH WEAPON CODE |
|---|---|---|---|

| DRIVER'S LICENSE NO | D.L. STATE | ARREST/CITATION NO | F.B.I NO | S.I.D NO | NIC NO | RES STATUS R |
|---|---|---|---|---|---|---|

| PERSON CODE VIC | CODE I | TYPE N | 3-NAME (LAST, FIRST, MIDDLE) Handler-Jacobs   Ruby | SOCIAL SECURITY NO | DOB 1952 | AGE (RANGE) 65 | SEX F | RACE W |
|---|---|---|---|---|---|---|---|---|

| STREET ADDRESS 800 CALLE DIVINA NE | APT NO | RES PHONE | HEIGHT 5'04" | WEIGHT 110 | HAIR BLN | EYES HAZ | ETHNICITY N | |
|---|---|---|---|---|---|---|---|---|

| CITY ALBUQUERQUE | STATE NM | ZIP 87113 | BUS PHONE | 1 | | | 1 FR |
|---|---|---|---|---|---|---|---|

| EMAIL | EMPLOYER/SCHOOL AND ADDRESS | | SUSPECT OF OFFENSE NO | ARRESTED FOR OFFENSE NO | GANG AFFILIATION |
|---|---|---|---|---|---|

| ALIAS / NICKNAME | MARKS/SCARS/TATTOOS | CLOTHING DESCRIPTION | ARMED WITH WEAPON CODE |
|---|---|---|---|

| DRIVER'S LICENSE NO | D.L. STATE NM | ARREST/CITATION NO | F.B.I NO | S.I.D NO | NIC NO | RES STATUS R |
|---|---|---|---|---|---|---|

## VEHICLE

| YEAR | MAKE | MODEL | BODY STYLE | LICENSE NO | LIC YEAR | LIC STATE | TOP COLOR | BTM COLOR | VALUE/DAMAGE EST |
|---|---|---|---|---|---|---|---|---|---|

| REGISTERED OWNER'S NAME | VIN | DISTINGUISHING FEATURES / VISIBLE DAMAGE |
|---|---|---|

| ADDRESS | TOW TO / BY | NIC NO |
|---|---|---|

| AGENCY OPTIONAL USE | TOWED FROM | OWNER NOTIFIED | DATE RECOV |
|---|---|---|---|

**Exhibit 6**

| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | ORIG. OFFENSE DATE 02-15-2017 | SUP. DATE 12-05-2017 | CASE NO 170074964 | | INC NO 172160811 | PAGE 1 | OF 2 |
|---|---|---|---|---|---|---|---|
| ORIGINAL OFFENSE REPORTED 30-16-6E     Fraud-Over $2500/Less $20000     2699 | | | ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE) Jacobs     Ruby | | | DATE OF BIRTH 1952 | |
| LOCATION OF OCCURRENCE 10800 FRAZIER LN SW | | | | ALBUQUERQUE | | 87121 | |

**OFFENSE**

| ADDITIONAL OFFENSE / INCIDENT | STATUTE OR ORDINANCE | FEL MISD | ATTEM PTED | COMPL LETED | UCR OFFENSE CODE | CRIMINAL ACTIVITY CODE | LOCAT CODE | WEAPON CODE | OFFENDER IS SUSPECTED OF USING |
|---|---|---|---|---|---|---|---|---|---|
| 4. | | | | | | | | | |
| 5. | | | | | | | | | |
| 6. | | | | | | | | | |
| 7. | | | | | | | | | |

**SUBJECTS (VICTIMS / SUSPECTS / PERSONS / BUSINESSES)**

PERSON CODES / TYPE CODES / INJURY CODES

| | | | 4. NAME (LAST, FIRST, MIDDLE) | SOCIAL SECURITY NO | DOB | AGE (RANGE) | SEX | RACE |
|---|---|---|---|---|---|---|---|---|
| STREET ADDRESS | | | APT. NO | RES PHONE | HEIGHT | WEIGHT | HAIR | EYES | ETHNICITY |
| CITY | | STATE | ZIP | BUS PHONE | | | | |
| OCCUPATION | EMPLOYER/SCHOOL AND ADDRESS | | | | SUSPECT OF OFFENSE NO | ARRESTED FOR OFFENSE NO | GANG AFFILIATION | |
| ALIAS / NICKNAME | | MARKS, SCARS, TATTOOS | | CLOTHING DESCRIPTION | | | ARMED WITH | |
| DRIVER'S LICENSE NO | D L STATE | ARREST/CITATION NO | F B I NO | S I D NO | | NIC NO | RES STATUS | |

| | | | 5. NAME (LAST, FIRST, MIDDLE) | SOCIAL SECURITY NO | DOB | AGE (RANGE) | SEX | RACE |
|---|---|---|---|---|---|---|---|---|
| STREET ADDRESS | | | APT. NO | RES PHONE | HEIGHT | WEIGHT | HAIR | EYES | ETHNICITY |
| CITY | | STATE | ZIP | BUS PHONE | | | | |
| OCCUPATION | EMPLOYER/SCHOOL AND ADDRESS | | | | SUSPECT OF OFFENSE NO | ARRESTED FOR OFFENSE NO | GANG AFFILIATION | |
| ALIAS / NICKNAME | | MARKS, SCARS, TATTOOS | | CLOTHING DESCRIPTION | | | ARMED WITH | |
| DRIVER'S LICENSE NO | D L STATE | ARREST/CITATION NO | F B I NO | S I D NO | | NIC NO | RES STATUS | |

| | | | 6. NAME (LAST, FIRST, MIDDLE) | SOCIAL SECURITY NO | DOB | AGE (RANGE) | SEX | RACE |
|---|---|---|---|---|---|---|---|---|
| STREET ADDRESS | | | APT. NO | RES PHONE | HEIGHT | WEIGHT | HAIR | EYES | ETHNICITY |
| CITY | | STATE | ZIP | BUS PHONE | | | | |
| OCCUPATION | EMPLOYER/SCHOOL AND ADDRESS | | | | SUSPECT OF OFFENSE NO | ARRESTED FOR OFFENSE NO | GANG AFFILIATION | |
| ALIAS / NICKNAME | | MARKS, SCARS, TATTOOS | | CLOTHING DESCRIPTION | | | ARMED WITH | |
| DRIVER'S LICENSE NO | D L STATE | ARREST/CITATION NO | F B I NO | S I D NO | | NIC NO | RES STATUS | |

**STATUS**

| REPORTING OFFICER (PRINT) ROYBAL,RENAE | RANK P1C | I D NO P5690 | DATE 12-05-2017 | DETECTIVE / FOLLOW-UP OFFICER / REFERRED TO | I D NO | DATE |
|---|---|---|---|---|---|---|
| ASSISTING OFFICER (PRINT) | RANK | I D NO | DATE | PROCESSED BY | DATE | DATA ENTRY PERSON | DATE |
| APPROVING OFFICER (PRINT) ABERNATHY,JEFFERY | RANK | I D NO P2605 | DATE 12-08-2017 | INCIDENT STATUS | | | DATE |

DISTRIBUTION: ☐ A  ☐ B  ☐ NE  ☐ SE  ☐ SW  ☐ VA  ☐ DAL  ☐ ETHL  ☐ OTHER  ☐ CACU  ☐ NW

CASES CLEARED BY THIS ARREST CASE NO / CASE NO / CASE NO

| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | ORIG. OFFENSE DATE 02-15-2017 | SUPP. DATE 12-05-2017 | CASE NO. 170074964 | | INC. NO. 172160811 | | PAGE 2 | OF 2 |
|---|---|---|---|---|---|---|---|---|
| ORIGINAL OFFENSE REPORTED 30-16-6E | | | ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE) Handler-Jacobs    Ruby | | | | DATE OF BIRTH ████ 1952 | |
| LOCATION OF OCCURRENCE 10800 FRAZIER LN SW | | | | | ALBUQUERQUE | | 87121 | |

1   On December 05, 2017 I was dispatched to 800 Calle Divina NE in reference to a theft.
2
3   Upon arrival I made contact with the caller who was identified as Ruby Handler-Jacobs. Ruby advised she had
4   been gone for an extended period of time, during which she had two individuals house sitting for her. The two
5   individuals, identified as Melissa Carroll and Brandon Clark, were recommended to Ruby by an acquaintance.
6
7   While she was away, Ruby discovered that several some checks were fraudulently being written from her
8   account to Melissa Carroll and were cashed. Officer J. Camp (#5337) took the initial report for this incident.
9   Being that she was out of New Mexico, Ruby's attorney Peter made the report in the SW area command. It
10  should be noted, however, the location this incident took place at was 800 Calle Divina NE.
11
12  Ruby recently returned to her home and advised she had found 7 more checks which had been written out to
13  Melissa Carroll. The 7 checks totaled $1949.58. Ruby also provided me with a list of items which had been
14  stolen from within her residence, and that list has been included with this report. The list includes 3 firearms,
15  miscellaneous documents and records, and mail.
16
17  Ruby did not have serial numbers for the firearms at this time. I explained to her that I would be unable to enter
18  those into NCIC without those numbers. She acknowledged understanding. Ruby explained there were many
19  other items (25 pages worth) taken from the house and she would provide that list at a later time.
20
21  The initial report had been forwarded to the southwest impact unit, Detective S. Lopez. This supplemental
22  report will be forwarded to Detective Lopez to aid in any follow up investigation that may be necessary. I have
23  also submitted copies of the checks as well as the list of missing items provided by Ruby.

| STATUS | REPORTING OFFICER (PRINT) ROYBAL, RENAE | RANK P1C | I.D. NO. P5690 | DATE 12-05-2017 | DETECTIVE / FOLLOW-UP OFFICER / REFERRED TO | | I.D. NO. | DATE |
|---|---|---|---|---|---|---|---|---|
| | ASSISTING OFFICER (PRINT) | RANK | I.D. NO. | DATE | PROCESSED BY | DATE | DATA ENTRY PERSON | DATE |
| | APPROVING OFFICER (PRINT) ABERNATHY, JEFFERY | RANK | I.D. NO. P2605 | DATE 12-08-2017 | CURRENT STATUS | CASE/DET CODE | A-DEATH OF OFFENDER B-PROSECUTION DECLINED C-EXTRADITION DENIED | S-VICTIM REF. TO COOP E-JUV. NO CUSTODY H-NOT APPLICABLE DATE |
| | DISTRIBUTION ☐ IA  ☐ B  ☐ NE  ☐ SW  ☐ DAL  ☐ OTHER ☐ SE  ☐ VA  ☐ FTHL ☐ CACU ☐ NW | | | | CASES CLEARED BY THIS ARREST CASE NO. CASE NO. | | CASE NO. | REV 3-94 |

| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | | ORIG OFFENSE DATE 02-15-2017 | SUP DATE 03-09-2018 | CASE NO 170074964 | | INC NO 172160811 | | PAGE 2 | OF 2 |
|---|---|---|---|---|---|---|---|---|---|
| ORIGINAL OFFENSE REPORTED 30-16-33E   Fraud Use CC-Ov $2500 Ls $20000   2605 | | | | ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE) Handler-Jacobs         Ruby | | | | | DATE OF BIRTH ▆▆1952 |
| LOCATION OF OCCURRENCE 10800 FRAZIER LN SW | | | | | ALBUQUERQUE | | | 87121 | |

**OFFENSE**

| ADDITIONAL OFFENSE / INCIDENT | STATUTE OR ORDINANCE | FEL MISD | ATTEM PTED | COMP LETED | UCR OFFENSE CODE | CRIMINAL ACTIVITY CODE | LOCAT CODE | WEAPON CODE | OFFENDER SUSPECTED OF USING ALCOHOL DRUG COMP USA |
|---|---|---|---|---|---|---|---|---|---|
| 4 | | | | | | | | | |
| 5 | | | | | | | | | |
| 6 | | | | | | | | | |
| 7 | | | | | | | | | |

**SUBJECTS (VICTIMS / SUSPECTS / PERSONS / BUSINESSES)**

PERSON CODES
TYPE CODES
INJURY CODES

| PERSON | TYPE | INJ | 4- NAME (LAST, FIRST, MIDDLE) | SOCIAL SECURITY NO | DOB | AGE (RANGE) | SEX | RACE |
|---|---|---|---|---|---|---|---|---|
| STREET ADDRESS | | | APT NO | RES PHONE | HEIGHT | WEIGHT | HAIR | EYES | ETHNICITY | AGG ASSAULT JUST HOM CODE |
| CITY | | | STATE | ZIP | BUS PHONE | | | | |
| OCCUPATION | EMPLOYER SCHOOL AND ADDRESS | | | | SUSPECT OF OFFENSE NO | ARRESTED FOR OFFENSE NO | GANG AFFILIATION |
| ALIAS NICKNAME | | MARKS SCARS TATTOOS | | CLOTHING DESCRIPTION | | | ARMED WITH WEAPON CODE |
| DRIVER'S LICENSE NO | D L STATE | ARREST CITATION NO | F B I NO | S I D NO | NIC NO | RES STATUS |

| PERSON | TYPE | INJ | 5- NAME (LAST, FIRST, MIDDLE) | SOCIAL SECURITY NO | DOB | AGE (RANGE) | SEX | RACE |
|---|---|---|---|---|---|---|---|---|
| STREET ADDRESS | | | APT NO | RES PHONE | HEIGHT | WEIGHT | HAIR | EYES | ETHNICITY | AGG ASSAULT JUST HOM CODE |
| CITY | | | STATE | ZIP | BUS PHONE | | | | |
| OCCUPATION | EMPLOYER SCHOOL AND ADDRESS | | | | SUSPECT OF OFFENSE NO | ARRESTED FOR OFFENSE NO | GANG AFFILIATION |
| ALIAS NICKNAME | | MARKS SCARS TATTOOS | | CLOTHING DESCRIPTION | | | ARMED WITH WEAPON CODE |
| DRIVER'S LICENSE NO | D L STATE | ARREST CITATION NO | F B I NO | S I D NO | NIC NO | RES STATUS |

| PERSON | TYPE | INJ | 6- NAME (LAST, FIRST, MIDDLE) | SOCIAL SECURITY NO | DOB | AGE (RANGE) | SEX | RACE |
|---|---|---|---|---|---|---|---|---|
| STREET ADDRESS | | | APT NO | RES PHONE | HEIGHT | WEIGHT | HAIR | EYES | ETHNICITY | AGG ASSAULT JUST HOM CODE |
| CITY | | | STATE | ZIP | BUS PHONE | | | | |
| OCCUPATION | EMPLOYER SCHOOL AND ADDRESS | | | | SUSPECT OF OFFENSE NO | ARRESTED FOR OFFENSE NO | GANG AFFILIATION |
| ALIAS NICKNAME | | MARKS SCARS TATTOOS | | CLOTHING DESCRIPTION | | | ARMED WITH WEAPON CODE |
| DRIVER'S LICENSE NO | D L STATE | ARREST CITATION NO | F B I NO | S I D NO | NIC NO | RES STATUS |

**STATUS**

| REPORTING OFFICER (PRINT) ROYBAL, RENAE | RANK P1C | I D NO P5690 | DATE 03-09-2018 | DETECTIVE / FOLLOW-UP OFFICER / REFERRED TO | | I D NO | DATE |
|---|---|---|---|---|---|---|---|
| ASSISTING OFFICER (PRINT) | RANK | I D NO | DATE | PROCESSED BY | DATE | DATA ENTRY PERSON | DATE |
| APPROVING OFFICER (PRINT) ABERNATHY, JEFFERY | RANK | I D NO P2605 | DATE 03-11-2018 | ACTIVE NAP CLEARED UP EXCEPT CODE EXCEPT CODE | A DEATH OF OFFENDER B PROSECUTION DENIED C EXTRADITION DENIED | D VICTIM REF TO COOP E JUV NO CUSTODY F NO C APP ICABLE | DATE |
| DISTRIBUTION ☐ IA  ☐ B  ☐ NE  ☐ SE  ☐ VA  ☐ SW  ☐ ETHL  ☐ DAL  ☐ CACU  ☐ OTHER ___  ☐ NW | | | | CASES CLEARED BY THIS ARREST CASE NO CASE NO | | CASE NO | |

| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | ORIG OFFENSE DATE 02-15-2017 | SUPP DATE 06-15-2018 | CASE NO 170074964 | | INC NO 172160811 | | PAGE 1 | OF 2 |
|---|---|---|---|---|---|---|---|---|
| ORIGINAL OFFENSE REPORTED 30-16-3A RESIDENTIAL | | ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE) Handler-Jacobs        Ruby | | | | | DATE OF BIRTH ███ 1952 | |
| LOCATION OF OCCURRENCE 800 CALLE DIVINA NE | | | | ALBUQUERQUE | | | 87113 | |

| | |
|---|---|
| 1 | On the listed date Ruby Handler- Jones called police to provide them with documents from a residential |
| 2 | burglary case that has been ongoing for approximately one year. Ruby advised that nothing has happened with |
| 3 | her case and that she has more evidence for her case. Upon reviewing the previous reports. the case was |
| 4 | given to SW Impact because her lawyer filed the initial report with SW units because his office is in the SW |
| 5 | area command. Due to the actual residence being in the Valley area command I will be tagging the new |
| 6 | evidence and forwarding the report to VA impact detectives. I had no further contact with Ruby Handler-Jones |
| 7 | on this date. |

| STATUS | REPORTING OFFICER (PRINT) WICKENS,TAYLOR | RANK P1C | I D NO P4776 | DATE 06-15-2018 | DETECTIVE / FOLLOW-UP OFFICER / REFERRED TO | | I D NO | DATE |
|---|---|---|---|---|---|---|---|---|
| | ASSISTING OFFICER (PRINT) WHITE,DAVID | RANK P1C | I D NO P4769 | DATE 06-15-2018 | PROCESSED BY | DATE | DATA ENTRY PERSON | DATE |
| | APPROVING OFFICER (PRINT) WHEELER,NICHOLAS | RANK | I D NO P3676 | DATE 06-24-2018 | INCIDENT STATUS | EXCEPT CLOSE | | DATE |
| | DISTRIBUTION ☐ B  ☐ NE  ☐ SW  ☐ DAL  ☐ OTHER ___ ☐ A  ☐ SE  ☐ VA  ☐ FTHL  ☐ CACU  ☐ NW | | | | CASES CLEARED BY THIS ARREST CASE NO CASE NO | | CASE NO | REV 3 94 |

| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | ORIG OFFENSE DATE 02-15-2017 | SUPP DATE 08-04-2017 | CASE NO 170074964 | | INC NO 172160811 | | PAGE 1 | OF 4 |
|---|---|---|---|---|---|---|---|---|
| ORIGINAL OFFENSE REPORTED 30-16-10C | | | ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE) Handler-Jacobs        Ruby | | | | DATE OF BIRTH ████ 1952 | |
| LOCATION OF OCCURRENCE 800 CALLE DIVINA NE | | | | ALBUQUERQUE | | | 87113 | |

**August 4, 2017**

Officer J. Camp #5337 was dispatched to 10800 Frazier Ln SW in reference to a fraud call. The comments on the call stated the caller was a retired attorney who advised both of his clients are currently incarcerated. The caller advised the house sitter had wrote fraudulent checks.

Officer Camp spoke with the caller, Peter Staiti who has power of attorney for Ruby Handler-Jacobs, who is the victim and owner for "No Stone Unturned" business). Peter stated Ruby is currently incarcerated in New York for Federal fraud charges. Peter stated Ruby hired a house sitter, Melissa Carroll, while she was away. Peter stated when he checked Ruby's bank statements, he observed money missing out from the account. When he collected the account statements, he observed checks written out by Melissa Carroll, which were fraudulently signed with Ruby's signature. Peter provided copies of the fraudulent checks.

**December 5, 2017**

Officer R. Roybal #5690 was dispatched to 800 Calle Divina NE in reference to a theft call. Officer Roybal spoke with the caller, Ruby Handler-Jacobs. Ruby stated she had been gone for an extended period of time, during which she had two individuals house sit for her. The two individuals were identified as Melissa Carroll and Brandon Clark.

While Ruby was away, she discovered that several checks were fraudulently being written from her account to Melissa and were cashed. Ruby provided Officer Roybal with more fraudulent checks and a list of items that were stolen from her residence. The list included three firearms, miscellaneous documents, records and mail. Ruby did not have serial numbers for the firearms and this time.

**March 9, 2018**

Officer Roybal was once again dispatched to 800 Calle Divina NE and spoke with Ruby. Ruby was able to provide a serial number for one of the firearms that were stolen. Ruby stated she had located a substantial amount of other items that had been taken from her house. all of which had not been reported initially as she had not organized it. Officer Roybal tagged all the documents into evidence.

**June 15, 2018**

Officer T. Wickens #4776 was dispatched to 800 Calle Divina NE. Officer Wickens spoke with Ruby and she provided more evidence to her case. Officer Wickens tagged the documents into evidence and forwarded this case to the Valley Impact Unit.

**November 1, 2018**

I was assigned this case to conduct a follow up investigation. I reviewed all the documents that Ruby provided that were tagged into evidence. There is a list of items that were stolen from her residence that she

| | REPORTING OFFICER (PRINT) WILLSEY.CODY | RANK DET | I D NO P5661 | DATE 08-04-2017 | DETECTIVE / FOLLOW-UP OFFICER / REFERRED TO | | I D NO | DATE |
|---|---|---|---|---|---|---|---|---|
| STATUS | ASSISTING OFFICER (PRINT) | RANK | I D NO | DATE | PROCESSED BY | DATE | DATA ENTRY PERSON | DATE |
| | APPROVING OFFICER (PRINT) VALDEZ.RUBEN | RANK | I D NO P3207 | DATE 01-15-2019 | INCIDENT STATUS | | DATE | |
| | DISTRIBUTION ☐ B ☐ NE ☐ SW ☐ CAL ☐ OTHER ☐ IA ☐ SE ☐ VA ☐ FTHL ☐ CACU ☐ NW | | | | CASES CLEARED BY THIS ARREST CASE NO CASE NO | | CASE NO | REV 3/94 |

| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | ORIG OFFENSE DATE 02-15-2017 | SUPP DATE 08-04-2017 | CASE NO 170074964 | INC NO 172160811 | PAGE 3 | OF 4 |
|---|---|---|---|---|---|---|
| ORIGINAL OFFENSE REPORTED 30-16-10C | | ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE) Handler-Jacobs     Ruby | | | DATE OF BIRTH ██████1952 | |
| LOCATION OF OCCURRENCE 800 CALLE DIVINA NE | | | | ALBUQUERQUE | 87113 | |

**November 6, 2018**

I contacted Ruby via telephone. She stated she allowed Brandon and Melissa to stay at her home during the time she was incarcerated. She stated the value of the items that were stolen are accurate and never gave Brandon, or Melissa permission to take her property. I told Rudy that I needed receipts of the property that were taken with exact amounts for the value and not a quote. Ruby stated she was unable to provide me with these documents because "they" burnt everything. Ruby talked for approximately 40 minutes without letting me speak and continued to repeat herself. Ruby stated she never gave Melissa permission to sign her names on the checks. I ended the interview.

I contacted the Federal Bureau of Investigations (FBI) and Immigration and Customs Enforcement (ICE) and spoke with the case agents for Ruby's Federal case. They stated the condition of Ruby's house was a mess and appeared to be a hoarder's house. They stated during the execution of their search warrant, they seized any electronic equipment and documents. I sent a request to ICE and requested the photographs from the execution of their search of Ruby's residence. I was contacted by ICE legal department and was told per 340 U.S. 461 (1951) "The Touhy Regulations" they were unable to provide me the photographs from the execution of the search warrant.

**November 7, 2018**

I attempted to contact Brandon and Melissa (505-307-9763) via telephone and left a voice message for him to contact me.

**January 9, 2019**

I have not heard back from Brandon or Melissa.

At this time, this case will be sent to the District Attorney's Office for review and prosecution. During the months that Ruby was not at the house, I am unable to confirm if Brandon sold the items that Ruby entrusted him with. Melissa will be charged for the fraudulent checks that she wrote in Ruby's name, while Ruby was incarcerated.

**CASE CONCLUSION**

The above case should be considered cleared exceptionally. A copy of the case will be sent to the Bernalillo County's District Attorney's Office for review and prosecution.

## ADDITIONAL PROPERTY

| PROPERTY STATUS | AR=ARSON BANNED CR=DAMAGE EV=EVIDENCE | FC=FIELD CONTACT FN=FOUND IM=IMPOUNDED | LS=LOST OB=OBSERVED ST=OTHER | RC=RECOVERED RP=RELEASE TO OUTSIDE AGENCY STOLEN PROPERTY RP=REPOSSESSION | SK=SAFEKEEPING SN=STOLEN STR=STOLEN AND RECOVERED | SU=SUSPECT SZD=SEIZED |
|---|---|---|---|---|---|

| PROPERTY TYPE | 1=CONSUMABLES 2=DRUGS 3=FOOD, LIQUOR, CONSUMABLES 4=CLOTHING, FURS 5=BOAT, MOTOR VEHICLE, AIRCRAFT 6=AUTO ACCESSORIES 7=CONSTRUCTION MACHINERY 8=CURRENCY, NEGOTIABLE ITEMS | 9=STRUCTURE A=NON-MEDICALIZED JEWELRY B=BICYCLE C=CAMERA PHOTO EQUIPMENT D=DATA PROCESSING EQUIPMENT E=EQUIPMENT, TOOLS F=FURNITURE AND TV G=GAMING EQUIPMENT | H=HOUSEHOLD APPLIANCES, HOUSEWARES I=IDENTIFICATION ITEMS J=MEDICAL DOCUMENTS, FOOD, STAMPS K=KEEPSAKES AND COLLECTIBLES L=LIVESTOCK M=MUSICAL INSTRUMENTS N=NON-SERIALIZED PROPERTY, JEWELRY, NOTED O=OFFICE EQUIPMENT, CELLULAR PHONES | P=PERSONAL ACCESSORIES (NON-SERIALIZED JEWELRY) Q=ELECTRONICS, AUDIO, STEREO, TV R=SPORTS, EXERCISE AND RECREATIONAL EQUIP S=TOXIC CHEMICALS U=VIEWING EQUIPMENT V=WELL, DRILLING EQUIPMENT W=NONE OF THE ABOVE X=CREDIT DEBIT CARDS | |

| DRUG TYPE | A=CRACK B=COCAINE C=HASHISH | D=HEROIN E=MARIJUANA F=MORPHINE | G=OPIUM H=OTHER NARCOTICS I=LSD | J=PCP K=OTHER HALLUCINOGENS L=AMPHETAMIN | M=OTHER N=BARBITURATES O=OTHER DEPRESSANTS | P=OTHER DRUGS Q=CANNABIS V=OVER-3 TYPES |
|---|---|---|---|---|---|

| FIELD UNIT OF MEASURE | DU=DOSAGE UNITS, ITEMS FO=FLUID OUNCE | GL=GALLON GM=GRAM | KG=KILOGRAM LB=POUND | LT=LITER ML=MILLILITER | NU=NUMBER OF PLANTS OZ=OUNCE | XX=NOT REPORTED |
|---|---|---|---|---|---|

| PROPERTY STATUS | PROPERTY TYPE | TYPE OF ITEM | MAKE / BRAND | MODEL | CALIBER | VALUE (EXCEPT DRUGS) |
|---|---|---|---|---|---|---|
| SUSPECTED DRUG TYPE | QUANTITY UNIT OF MS | DESCRIPTION (COLOR, SIZE, FEATURES, ETC.) | | SERIAL / OAN | DATE RECOVERED | NIC NO. |
| PROPERTY STATUS | PROPERTY TYPE | TYPE OF ITEM | MAKE / BRAND | MODEL | CALIBER | VALUE (EXCEPT DRUGS) |
| SUSPECTED DRUG TYPE | QUANTITY UNIT OF MS | DESCRIPTION (COLOR, SIZE, FEATURES, ETC.) | | SERIAL / OAN | DATE RECOVERED | NIC NO. |
| PROPERTY STATUS | PROPERTY TYPE | TYPE OF ITEM | MAKE / BRAND | MODEL | CALIBER | VALUE (EXCEPT DRUGS) |
| SUSPECTED DRUG TYPE | QUANTITY UNIT OF MS | DESCRIPTION (COLOR, SIZE, FEATURES, ETC.) | | SERIAL / OAN | DATE RECOVERED | NIC NO. |
| PROPERTY STATUS | PROPERTY TYPE | TYPE OF ITEM | MAKE / BRAND | MODEL | CALIBER | VALUE (EXCEPT DRUGS) |
| SUSPECTED DRUG TYPE | QUANTITY UNIT OF MS | DESCRIPTION (COLOR, SIZE, FEATURES, ETC.) | | SERIAL / OAN | DATE RECOVERED | NIC NO. |
| PROPERTY STATUS | PROPERTY TYPE | TYPE OF ITEM | MAKE / BRAND | MODEL | CALIBER | VALUE (EXCEPT DRUGS) |
| SUSPECTED DRUG TYPE | QUANTITY UNIT OF MS | DESCRIPTION (COLOR, SIZE, FEATURES, ETC.) | | SERIAL / OAN | DATE RECOVERED | NIC NO. |
| PROPERTY STATUS | PROPERTY TYPE | TYPE OF ITEM | MAKE / BRAND | MODEL | CALIBER | VALUE (EXCEPT DRUGS) |
| SUSPECTED DRUG TYPE | QUANTITY UNIT OF MS | DESCRIPTION (COLOR, SIZE, FEATURES, ETC.) | | SERIAL / OAN | DATE RECOVERED | NIC NO. |
| PROPERTY STATUS | PROPERTY TYPE | TYPE OF ITEM | MAKE / BRAND | MODEL | CALIBER | VALUE (EXCEPT DRUGS) |
| SUSPECTED DRUG TYPE | QUANTITY UNIT OF MS | DESCRIPTION (COLOR, SIZE, FEATURES, ETC.) | | SERIAL / OAN | DATE RECOVERED | NIC NO. |

| COMMENTS REGARDING PROPERTY | TOTAL VALUE STOLEN $ | TOTAL VALUE REC $ |
|---|---|---|

## ADDITIONAL VEHICLES

| ACTION CODE | AC=TRAFFIC ACCIDENT BR=BURNED ARSON DM=DAMAGED, VANDALIZED EM=EMBEZZLED | EV=EVIDENCE FC=FIELD CONTACT IM=IMPOUNDED LS=LOST | OR=OUTSIDE RECOVERY RC=RECOVERED REL=RELEASED TO OWNER RP=REPOSSESSION | OTHER AGENCY SEZ=SEIZED ST=STOLEN SUS=SUSPECT | SAR=STOLEN AND RECOVERED TO=TOWED VE=VICTIM VEH W=WARRANT ON OWNER | VEH TYPE CODE 1=AUTO 2=TRUCK/VAN 3=MOTORCYCLE | 4=CAMPER/RV 5=BUS 6=OTHER | 7=ATV 8=SNOWMOBILES 9=UNKNOWN |
|---|---|---|---|---|---|---|---|

| YEAR | MAKE | MODEL | BODY STYLE | LICENSE NO. | LIC YEAR | LIC STATE | TOP COLOR | BTM COLOR | VALUE/DAMAGE EST |
|---|---|---|---|---|---|---|---|---|---|

| REGISTERED OWNER'S NAME | VIN | DISTINGUISHING FEATURES / VISIBLE DAMAGE |
|---|---|---|

| ADDRESS | TOW TO / BY | | NIC NO. |
|---|---|---|---|

| AGENCY OPTIONAL USE | TOWED FROM | ☐ OWNER NOTIFIED | DATE RECOVERED | TIME RECOVERED |
|---|---|---|---|---|

| ACTION CODE | AC=TRAFFIC ACCIDENT BR=BURNED ARSON DM=DAMAGED, VANDALIZED EM=EMBEZZLED | EV=EVIDENCE FC=FIELD CONTACT IM=IMPOUNDED LS=LOST | OR=OUTSIDE RECOVERY RC=RECOVERED REL=RELEASED TO OWNER RP=REPOSSESSION | OTHER AGENCY SAR=STOLEN AND RECOVERED ST=STOLEN SUS=SUSPECT | TO=TOWED VE=VICTIM VEH W=WARRANT ON OWNER | VEH TYPE CODE 1=AUTO 2=TRUCK/VAN 3=MOTORCYCLE | 4=CAMPER/RV 5=BUS 6=OTHER | 7=ATV 8=SNOWMOBILES 9=UNKNOWN |
|---|---|---|---|---|---|---|---|

| YEAR | MAKE | MODEL | BODY STYLE | LICENSE NO. | LIC YEAR | LIC STATE | TOP COLOR | BTM COLOR | VALUE/DAMAGE EST |
|---|---|---|---|---|---|---|---|---|---|

| REGISTERED OWNER'S NAME | VIN | DISTINGUISHING FEATURES / VISIBLE DAMAGE |
|---|---|---|

| ADDRESS | TOW TO / BY | | NIC NO. |
|---|---|---|---|

| AGENCY OPTIONAL USE | TOWED FROM | ☐ OWNER NOTIFIED | DATE RECOVERED | TIME RECOVERED | REV 3-94 |
|---|---|---|---|---|---|

PHOTOGRAPHS OF 800 CALLE DIVINA NE IN DECEMBER 2017


Fireplace with ashes


Dog feces on bedroom floor.


For sale signs

Burned documents


Garage sales set up.


Trashed bedroom

Price tag on photograph that is valued over $5,000.




All clothes stolen – empty closet

Destroyed Limoges Statute of Liberty valued at $5,000.

Frame with photograph missing

Box of checks used by Carroll


Wedding Dress


Soiled toilet and gun magazines.



Exhibit
7

Mr. and Mrs. Michael Jacobs
800 Calle Divina NE
Albuquerque, NM 87113
Tel: (505) 321-3044

May 26, 2021

VIA Certified U.S. Mail #7018 1130 0001 3474 4271 and email

Ms. Sarita Nair
Chief Administrative Officer
Office of the Mayor
P.O. Box 1293
Albuquerque, NM 87103
Email: wburleigh@cabq.gov


Re: Chief Harold Medina Letter dated April 26, 2021 // File: CPC# 210-20

Dear Ms. Nair;

We write this as an allowed appeal per the referenced attached letter from APD Chief Medina (Attachment 1), regarding the findings (the "findings") of the Civilian Police Oversight Agency ("CPOA"). We are not satisfied with said findings as we believe they were not the result of an impartial or unbiased investigation as evidenced by the writing therein. The proof we have found lies within these findings.

Therefore, in our letter of appeal we provide proof that the COPA findings are full of contradictions, misspellings, incorrect grammar and sentences that are simply gibberish. We state that: (A) the policies considered by the COPA Board (CPOAB) were used in a wrong way; (B) CPOAB considered random policies which did not address the issues presented in our complaint; (C) explanations were not fully thought out leading to inappropriate conclusions; and (D) findings of the CPOAB were not supported by available evidence, many of which were absent from the findings.

Firstly, the findings neglect to include many officers and employees as outlined in our Albuquerque Police Department Timeline ("APD Theft TimeLine")(See Attachment 2). This is questionable. We list the following, indicating officers and status mentioned in the findings:

| Officer Jonathan Camp (Man# 5337) | NE Division |
|---|---|
| APD Officer Jose Sanchez (Man# P5041) | NE Division |
| Officers Renae Roybal (Man# 5690) | NE Division |
| Sgt Jason | John A. Carrillo substation |
| Officer A. Sampong (Man# 5657) | |
| "Detective" Stephanie Lopez | SW Division |
| Officer Miera | SW Division |

**Exhibit 8**

1

Apparently, jumping back to the 12/05/17 event in the Findings, Officer Roybal was asked to document in her report the condition of the rooms in the home as <u>Ms. Jacobs' need to have the home made habitable.</u>

Ms. Jacobs thought it important for Off Roybal to view the rooms. Her comment "I did not know what they looked like before," is flippant. Implying that Ms. Jacobs could have lived in a home for over 14 years and have absolutely nothing (no clothes, shoes, underwear, nothing in the bathroom, etc.), is insulting, as well as implying that the dog feces all over the carpets had been there for over 11 months [note: we never had a dog]. Then there is the issue of Officer Roybal not even looking in the garage where the thieves had tables set up for their garage sales. Ms. Jacobs was therefore denied that confirmation of the evidence by Officer Roybal's refusals.

"Regarding the theft portion": The one-sheet of critical items provided to Officer Roybal (on 12/05/17) was not mentioned. Because the Findings are convoluted, it jumps to "Officer Roybal stated it did not do her any good to go in the room (which room(s)?) as she did not know what the room looked like before" (See statement above about Mr. Staiti) The officer then advised "Ms. Jacobs [to] creat[e] an itemized list of what was taken, [so] they could go somewhere" (to prosecute the perpetrators for theft). This statement indicates that Officer Roybal stated that the APD would pursue the theft of the stolen chattel, which they did not.

However, upon returning on 03/09/18, one of the reasons Officer Roybal refused to take the additional report was that she claimed it had already been taken! (forgetting that it was she who advised Ms. Jacobs to complete the list of the items of the theft). And why was a reason to not take a report because it is "too big" a valid reason?

Then there is a huge issue regarding the SW Division and them "being assigned the case." ***This was never true.*** So if Officer Roybal claims that "she was told" that the SW Division (and specifically Officer or Detective? Lopez ("Lopez")) was assigned to the case and this was never true, by whom and how did this happen? Why is gross misinformation and miscommunication allowed in any Police Dept?

Also it is clear in several places in the Findings that the SW Division ***could not*** ever handle nor be assigned to a case in the NE quadrant which is site specific. So ***why*** would Officer Roybal ***not*** know this fact? No case that is site specific in any division can be handled by another division. CPOA Findings do not address this.

Therefore, when Officer Roybal continued to contact, email, "send over" information to Lopez in the SW Division, this was all for naught, ***as they were not handling the case!*** This is gross incompetence. Where did this come from? It appears that this error lies deeper as to "whom" informed Officer Roybal of this gross misinformation. The Findings ramble on about all of this misinformation and treats it as if it is correct and is satisfactory behavior.

One comment even states that Lopez did not respond to Officer Roybal's second email... ***because this was not her case!*** Although Lopez is now no longer with the APD, this behavior must be attributed to the organization as a whole and its' disfunction including training policies.

The Findings also go on to say that Detective Willsey checked with pawn shops and did not find evidence of the thieves selling anything to a pawn shop. Is this the only thing he did? Detective Willsey seemed to be so focused on the appraisal that he disregarded the theft of other household items, including jewelry, clothing, furniture and heirlooms that were well over a million dollars, stolen or disposed of by the house-sitters and their accomplices.

There is *no* mention if *any* officer or detective ever viewed all the photographs that were turned in as evidence by Ms. Jacobs. If they had, the photographs would clearly show evidence of the thieves conducting garage sales out of our garage. This was also something that Officer Roybal refused to view in the house, the evidence in the garage that was still at that time with tables of various items "for sale" with hand-written price tags on them. So that was one of the means of "disposing" of the "stolen items." Another way of disposal as evidenced in the photographs turned in by Ms. Jacobs, was the massive amount of ashes in the house and outside on the property, of burned items, including photographs, documents and other "stolen" property by the thieves.

The insurance company conducted a far better investigation in 2018 than the APD. They interviewed neighbors who confirmed the garage sales and further confirmed the thieves even hiring a dumpster that sat in front of the house, literally "dumping" or throwing away much of the stolen property. This was not only a theft as orchestrated by the house-sitters to have monetary gain from the "stolen items," but the rid the home of property to harm the owners (the Jacobs) and to "make room" for 13 other residents to illegally occupy the home and then to allow all of the unlawful occupants to further steal items and property in the home.

The insurance company also interviewed neighbors who confirmed that the neighbors were told by the thieves that we were *dead* and that is why they were selling and removing, throwing away, etc. all of our belongings without suspicion. This shows clear intent to not only steal, but to destroy and harm us.

Detective Willsey never conducted any sort of appropriate investigation which found any of the above evidence as evidenced by the police reports. The Findings state that Detective Willsey states "there were no other leads to go off at that time!" It further states that he "was unable to locate any other contacts." This Findings further state that Detective Willsey stated that "he knew Ms. Jacobs provided some paperwork with some notes and names that were written on napkins (!?) and stuff like that... but he knew he did not talk with those people as he did not know their involvement at all." No investigation... nothing! Furthermore,

There is no mention of the one sheet of investigating "critical items" that was turned in to Officer Roybal on 12/05/17 and the theft of the critical items such as 3 firearms, Ms. Jacobs' U.S. Marshal Badge ("USMS"), Passport ID information, Certificate of Canadian Citizenship, Social Security cards information, Military DD-214 ID, etc.

Interestingly enough, Ms. Jacobs was told this year, by an APD officer, and as a result of the prejudice she received when filing the report of the account takeovers, that Clark and Carroll show at least eight or nine other addresses in the last couple of years over three states (AZ, CO

General Order 1-1-4D.15: Officer Roybal and Detective Willsey
General Order 1-1-4D.14: Detective Willsey
Procedural Order 2-60-4A.5.d: Officer Roybal. Also failed in "a through f."
Procedural Order 2-60-4B.5.b: Detective Willsey failed. Also failed "b, e through k."
Procedural Order 2-60-4B.5.m: Detective Willsey failed in notification
Procedural Order 2-60-4A.5.f: Officer Holmen failed.

We also claim violations of:

General Order 1-1-4A: Failure by all officers
General Order 1-1-4B.2: Failure to protect our rights
General Order 1-1-4B.5: Failure by violating the rules
General Order 1-1-4B.6.b: Failure by supervisors
General Order 1-1-4D.17: Failure to act upon information in a proper and judicious manner
General Order 1-1-4D.19.a: Detective Willsey, Officer Roybal

However, in looking at the overall investigation by the officers and detectives, it adds up to a gross miscommunication within APD, incompetence and a *failure* to investigate properly which resulted in nothing - therefore the criminals are getting away with their crimes, free to harm others. And we continue to suffer harm due to the loss and exasperated by the incompetence of the APD.

The Bernalillo County District Attorney's Office declined to press charges based only upon the forged checks issue by one of the house-sitters. The APD did not provide competent reports about the massive theft of our chattel the house-sitters and their gang of accomplices. We said that we wanted to press charges against the entire gang and still aver we are pressing charges.

This is our appeal.

Sincerely,

Ruby Jacobs

Michael Jacobs

cc: Chief Harold Medina

## JACOBS THEFT AND FORGERY TIMELINE

| Date On or About | Narrative |
|---|---|
| Beginning 12/11/16 | Washington Federal Business account (account) holder Ruby Hander Jacobs (Mrs. Jacobs) was generally incommunicado during this period in another State, however, she did have some communication with family attorney Mr. Peter Staiti ("Mr. Staiti"), her authorized Attorney-In-Fact with her Power of Attorney ("POA"). and ATM cards. Mrs. Jacobs banked at the Washington Federal National Bank ("WAFD") branch, 4400 Osuna Rd NE, Albuquerque, NM 87109. |
| 12/15/16 | Mrs. Jacobs conferred with Mr. Staiti who said that he would go to her house at 800 Calle Divina NE, Albuquerque, NM 87113 and retrieve all of the blank checks. |
| 12/19/16 | Mr. Staiti reported to Mrs. Jacobs that he requested from the contracted house-sitter's paramour, Melissa Carroll ("Ms. Carroll") to give him all of the checks. Mr. Staiti then reported to Mrs. Jacobs that Ms. Carroll told him that she gave him possession of all the checks. However, later on, it was discovered that she withheld a couple of checks boxes. This clearly shows deliberate intent. |
| 03/31/17 | Attorney Staiti discovered approximately $10,000 missing from Mrs. Jacobs' business checking account. |
| 04/01/17 | Mr. Staiti contacted Ms. Carroll and the contracted house sitter Brandon Clark ("Mr. Clark") requesting the mail that was delivered to the Jacobses home in order to see the bank statements. This request was refused. |
| 04/03/17 | Mr. Staiti, with POA in hand, went to the bank and met with WAFD Personal Banker, Wesley Salazar ("Mr. Salazar"), to access the account because of his missing funds discovery. At this meeting, WAFD refused to honor Staiti's POA, but they did freeze the account without providing Mr. Staiti with any information. WAFD would not provide any bank statements. |
| 04/04/17 Through July 2017 | Mr. Staiti began to make several attempts to get a POA that was satisfactory to WAFD. Finally, WAFD gave him their version of a POA and Mr. Staiti had it signed and notarized by Mrs. Jacobs, but not until the end of July, |
| May 2017 | In the meantime, WAFD demanded a copy of a non-existent partnership agreement for Mrs. Jacobs' company. |
| 05/05/17 | Mr. Michael Jacobs (Mr. Jacobs), Mrs. Jacobs' husband, wrote a letter to Mr. Salazar answering the WAFD demand for the partnership agreement stating that Mrs. Jacobs is sole proprietor of the business and that no agreement exists. |
| 05/17/17 | This was most likely the last day of fraudulent activity by Ms. Carroll when a forged check was presented for payment to WAFD by a check cashing company. Discovery was made (see December 2017 below). |
| End of Jul 2017 | Mr. Staiti was finally given access to the account. WAFD printed out copies of $9,730.74 in forged checks. These were written by Ms. Carroll, paid to herself, with all checks being in her handwriting, and by forging Mrs. Jacobs signature. |

## JACOBS THEFT AND FORGERY TIMELINE

| Date On or About | Narrative |
|---|---|
| | house when asked by Mrs. Jacobs (See **Exhibit I**). Roybal stated that she "didn't know what the house looked like before." Mrs. Jacobs was horrified at Officer Roybal's attitude leaving her with feeling that Roybal was treating her as a perpetrator rather than the victim. Plus the fact that Mr. Staiti was there and also knew the condition of the house in that it was trashed and robbed. Mrs. Jacobs made it very clear to Officer Roybal that she would be filing a more complete theft report after the one-page. |
| **NOTE:** | *Incorporated in the filed Report 1, Officer Roybal incorrectly refers to Stephanie Lopez as a detective of the Southwest Impact Unit in her Report 2 SuppReport dated 12/05/17 and that she gave the one-page to the SW Unit, even though she admits that the check-writing and theft took place in the NE.* |
| Dec 2017 | Mr. Staiti and Mrs. Jacobs went to WAFD, met with Mr. Salazar, to see copies of all the bank statements. Due to bank error in not finding or providing all of the forged checks, at this time it was discovered that Ms. Carroll had forged an additional $500 in checks in January 2017 that were paid from Mrs. Jacobs' account. This brought the direct loss to $10,230.74. Furthermore, it was then discovered that Ms. Carroll had forged five checks during April and May in the amount of $1,449.58 that she was able to negotiate in several check cashing businesses in Albuquerque.  According to the owner of El Alamo Check Cashing, when Mrs. Jacobs called them, Ms. Carroll was able to cash the checks without "verification" of the hand-written checks, as Ms. Carroll told El Alamo that "she was the owner of the company." The El Alamo verified that the customer was in fact Ms. Carroll. |
| Dec 2017 | In assessing the damage at her home, Mrs. Jacobs discovered that approximately 13 other people were unlawful occupants later in mid-2017 after the forged checks incidents. (See **Exhibit D**). There was a total of 17 persons living in the house. (Four were Clark, Carroll and two children) |
| Jan to Feb 2018 | Mrs. Jacobs spent this time going through the debris at her home to complete a list of personal property stolen by the house sitters et al. Mrs. Jacobs' husband, Michael Jacobs ("Mr. Jacobs"), who was still out of State, also composed a list of his personal items that he recalled were stolen. This included his professional work and equipment. |
| 03/09/18 | Mrs. Jacobs called "242COPS" and spoke with Sgt Jason of the APD at the John A. Carrillo substation requesting an officer to return to the home to take the rest of the earlier theft Report. APD Officer A. Sampong (Man# 5657) and APD Officer Roybal (Man# 5690), who again was sent to the home, refused to take the report because she stated, "that a report was already taken." The document and supporting evidence complied by Mrs. Jacobs was approximately 2" thick along with flash drive containing photographs. Officer Roybal further refused to take anything stating that it was "too big" and also that "this was being handled by the Southwest Division" by an APD Detective |

### JACOBS THEFT AND FORGERY TIMELINE

| Date<br>On or About | Narrative |
|---|---|
| 05/21/18 | Mrs. Jacobs called the APD headquarters downtown and was routed to Rochelle who was on the Chief of Police's staff. Mrs. Jacobs was told to call "242 COPS". Mrs. Jacobs informed Rochelle that this had already been done when she called on 03/09 and Officer Roybal was sent to the home and refused to take the report. Rochelle then further instructed Mrs. Jacobs to call NE Commander Joseph Burk and gave her the phone number. |
| 05/21/18 | Mrs. Jacobs called Commander Burk and recounted the story of the case. He said he would "skip the Sgt" (meaning Westbrook) and have a lieutenant call her. A lieutenant never called Mrs. Jacobs. |
| 05/23/18 | In the morning Mrs. Jacobs received a telephone call from an angry and rude Sgt. Westbrook who told her that a supervisor needs to go to her home and that the case needs to be forwarded to the Organized Crime Unit. He gave her the telephone number of the Unit. |
| 05/23/18 | A shaken Mrs. Jacobs then called and left a message for Commander Burk who never called her back. |
| 05/24/18 | Mrs. Jacobs called the Organized Crime Unit and reached a recording that states that they do not take cases on the phone. She left a message that she was referred by Sgt. Westbrook. She never received a call back from the Unit. |
| 06/06/18 | As Mrs. Jacobs was making no progress, she contacted the Chief's office again, spoke to Annabelle who referred her to Chief Mike Geier's office, who then referred her to John Ross, the chief of staff. He told her that he would call her back after investigating the situation. He did not call her back. |
| 06/12/18 | Mrs. Jacobs again called the Chief's office and spoke to Michelle who said she would call her back after she speaks with her supervisor. No return calls. |
| 06/14/18 | Mrs. Jacobs called the Chief's office and again spoke to Annabelle. Frustrated, Mrs. Jacobs told her that she would come there in person to file the case because she was not getting anywhere. Six months had passed. Annabelle said "no, don't do that" finally telling her that she needs to go through the chain of command and advised her to call "242COPS." Because of the previous encounters with Officer Roybal, Annabelle told Mrs. Jacobs that she could ask that Officer Roybal not be sent. |
| 06/14/18 | Mrs. Jacobs did call "242COPS" with APD Officers David White (Man# 4769) and Taylor Wickens (Man# 4776) finally responding at midnight. However, they gave the new report ("**Report 3**") the same case number as the SW Division forged checks case but said they would forward the case to the Valley Impact Unit (which they also said it should have been in the first place, not the NE Impact Unit). They provided Mrs. Jacobs with a hand-written note that they would send this to the Valley Impact Unit. At this time, Mrs. Jacobs gave them the 2" file along with the flash drive of photographs. Mrs. Jacobs also provided the additional found forged checks by Ms. Carroll equaling a total of $10,230.74 along with the forged checks to the cash checking businesses in the amount of |

### JACOBS THEFT AND FORGERY TIMELINE

| Date<br>On or About | Narrative |
|---|---|
| | five-year update. Mrs. Jacobs was of the impression that Det. Willsey had no interest and would not pursue the case at all. |
| NOTE: | *In Det. Willsey's SuppReport incorrectly dated 08/04/17 on Page 2 of 4, of the Report he reported that the Jacobs' photographic appraisal had a fair market value of $5,694,375.00. Det. Willsey incorrectly concludes that "the values appear to be based on Ruby's opinion only." Along with the appraisal, Mrs. Jacobs gave to the APD a Clarification on Methods of Valuation (Clarification") by the licensed appraiser of how anyone is to interpret an appraisal which is not how Det. Willsey did interpret the value of the appraisal, nor did he recall having seen this supplied Clarification. (See Exhibit F). Furthermore, Mrs. Jacobs supplied the APD with the Bill of Sale (excerpts) which was recorded with Bernalillo County in 2008, accompanied with the appraised amounts, which also clearly showed the value of each of the sections of the photographs. (See Exhibit G). In concert with his behavior, Det. Willsey ignored the appraiser's value and the County Recorder documents, both deliberately and willfully dismissing the value in his SuppReport while disparaging Mrs. Jacobs. Det. Willsey neither showed interest nor desire to meet with Mrs. Jacobs or to handle any investigation with this case. Det. Willsey told Mrs. Jacobs that he never saw any of the photographs of the trashed house on the flash drive.* |
| NOTE: | *In Det. Willsey's SuppReport on Page 3 of 4, he reported that on 11/06/18 "Ruby talked for approximately 40 minutes without letting me speak and continued to repeat herself…." again leaving a false light impression of Mrs. Jacobs. She's a senior citizen and was still in shock from the theft and forgeries, and from the abominable behavior of Det. Willsey and the APD. This was an inappropriate addition to his report with a brazen opinion.* |
| 01/15/19 | Sgt. Valdez allegedly approved the Report |
| 01/09/19 | Det. Willsey in his SuppReport in Page 3 of 4 he states that he is "unable to confirm if Brandon sold the items" yet does not make mention of the property theft itself. The fact is almost everything in the home was gone. Det. Willsey uses the term "sold" yet it doesn't matter if all the property was sold, burned, stolen or otherwise discarded…the items were gone!  Further Det. Willsey wrote that "Melissa will be charged for the fraudulent checks." <u>Nothing was mentioned about the Jacobs' three cats that were killed by the house sitters.</u> The investigation by Det. Willsey was inconsiderate, careless, abysmal and wholly incompetent. |
| Dec 2018 to Jul 2019 | Mr. and Mrs. Jacobs were unaware of Det. Willsey's investigation or final Report. |
| 09/12/19 | Mr. Jacobs left a message for Det. Willsey.  No response |
| 09/19/19 | Mr. Jacobs left a message for Det. Willsey.  No response |
| 09/25/19 | Mr. Jacobs left a message for Det. Willsey.  No response |

## JACOBS THEFT AND FORGERY TIMELINE

| Date On or About | Narrative | | |
|---|---|---|---|
| 02/20/17 | Jul 2017 | $320.00 | |
| 02/21/17 | Jul 2017 | $363.21 | |
| 02/22/17 | Jul 2017 | $500.16 | |
| 02/27/17 | Jul 2017 | $503.16 | |
| 03/06/17 | Jul 2017 | $621.43 | |
| 03/08/17 | Jul 2017 | $460.00 | |
| 03/10/17 | Jul 2017 | $673.37 | |
| 03/13/17 | Jul 2017 | $700.00 | |
| 03/16/17 | Jul 2017 | $720.00 | |
| 03/21/17 | Jul 2017 | $351.12 | |
| 03/23/17 | Jul 2017 | $461.00 | |
| 03/24/17 | Jul 2017 | $546.17 | |
| 03/27/17 | Jul 2017 | $620.00 | |
| 03/28/17 | Jul 2017 | $380.00 | |
| 03/28/17 | Jul 2017 | $361.12 | |
| 03/30/17 | Jul 2017 | $800.00 | |
| 01/26/17 | Dec 2017 | $200.00 | |
| 01/31/17 | Dec 2017 | $300.00 | |
| 04/27/17 | Dec 2017 | $250.00 | |
| 05/02/17 | Dec 2017 | $278.58 | |
| 05/02/17 | Dec 2017 | $361.00 | |
| 05/02/17 | Dec 2017 | $300.00 | |
| 05/17/17 | Dec 2017 | $260.00 | |

## LIST OF MISSING ITEMS & VALUE

### *- Noted as more valuable

### *I* - Noted as Irreplaceable

## CRITICAL ITEMS

### Guns:

| | |
|---|---|
| Charter Arms 38 revolver, registered in name of Ruby Jacobs, # RIA1846199 | 425.00 |
| Colt 38 revolver, detective special with wooden handle (Ruby Jacobs) | 400.00 |
| 45 semi-automatic owned by No Stone Unturned Security | 250.00 |

### Confidential & Critical Information:

*(All the following can be used or sold for identity theft & other direct theft)*

**All mail stolen.**   This has also been reported to the Postal Inspector

All bank accounts & banking records stolen; all credit card information;

All other charge account information, for personal & companies; SS#s

All company ID #s & personal pin #s for additional stolen identity usage & theft

**All prescription drugs stolen & medical equipment.**   *(see attached separate list)*

Naturalization papers for Michael Jacobs for the U.S. & for Canada

Military papers & records for Michael Jacobs

Canadian Citizen Papers for Michael Jacobs

Old expired Passports (but same #s) U.S. for Michael Jacobs, Ruby Jacobs,

And also British Passport for Michael Jacobs

Canadian Passports for Paula Jacobs & Leslie Jacobs (Michael's parents)

Green cards for Paula Jacobs & Leslie Jacobs

Social Security #s for Ruby's son, Dr. Aaron Handler, sister, Ruth LeMaster &

mother & father, Emily LeMaster & Lundy LeMaster

All medial & dental records *(confidential)*

### U. S. Marshal's badges

**Gross theft & destruction of property, intent to harm, cause emotional distress & intent to cause bodily harm and death, Senior Abuse.**



**Exhibit 9**

<u>**Master Summary List Totals of Financial Loss of Theft & destruction**</u>

**Stolen or destroyed** from Jacobs, 800 Calle Divina NE, Albuquerque, NM 87113

**by** Brandon Dewayne Clark & Melissa Carol
   assisted by William Jones, Genienne Conaway Riggle, Ashton Swan, Candie Swan
   and Jeremy Stone and possible others.


List of Missing Items & Value
   Firearms                                                                      1,075.
   All rooms                                                               1,067,688.

Additional List                                                     641,451,650.

Dental                                                                        3,432.85

Dr. prescribed medications & supplements (not covered by medical ins.)      1,969.91

Additional receipts found (a few, most destroyed)                 1,229.83


**Total**                                                            <u>**$642,527,045.59**</u>


<u>**Six Hundred Forty Two Million Five Hundred Twenty-seven Thousand Forty-five Dollars**</u>
                                                                   **and 59 cents**


<u>Also given with this report, a Lexor thumb drive with photographs taken upon entering my home,
which primarily shows evidence of many empty rooms & spaces, trash, filth, ashes & the mass theft
and destruction.</u>


<u>Respectfully submitted to Albuquerque Police Dept. by Ruby Jacobs</u>
   Phone # (505) 210-6693


**Exhibit
10**

## LIST OF MISSING ITEMS & VALUE

### *- Noted as more valuable

### *I* - Noted as Irreplaceable

## CRITICAL ITEMS

### Guns:

| | |
|---|---|
| Charter Arms 38 revolver, registered in name of Ruby Jacobs, # RIA1846199 | 425.00 |
| Colt 38 revolver, detective special with wooden handle (Ruby Jacobs) | 400.00 |
| 45 semi-automatic owned by No Stone Unturned Security | 250.00 |

## Confidential & Critical Information:

*(All the following can be used or sold for identity theft & other direct theft)*

**All mail stolen.**  This has also been reported to the Postal Inspector

All bank accounts & banking records stolen; all credit card information;

All other charge account information, for personal & companies; SS#s

All company ID #s & personal pin #s for additional stolen identity usage & theft

**All prescription drugs stolen & medical equipment.**  *(see attached separate list)*

Naturalization papers for Michael Jacobs for the U.S. & for Canada

Military papers & records for Michael Jacobs

Canadian Citizen Papers for Michael Jacobs

Old expired Passports (but same #s) U.S. for Michael Jacobs, Ruby Jacobs,

And also British Passport for Michael Jacobs

Canadian Passports for Paula Jacobs & Leslie Jacobs (Michael's parents)

Green cards for Paula Jacobs & Leslie Jacobs

Social Security #s for Ruby's son, Dr. Aaron Handler, sister, Ruth LeMaster &

mother & father, Emily LeMaster & Lundy LeMaster

All medial & dental records (*confidential*)

### U. S. Marshal's badges

### Gross theft & destruction of property, intent to harm, cause emotional distress & intent to cause bodily harm and death, Senior Abuse.

## MASTER BEDROOM, CLOSETS, BATHROOM

*I* – <u>All clothes</u> – Suits, jackets, pants, shirts, sweaters, bathrobes, nightgowns, blouses, leathers – many designer names (Benneton, Ann Klein, Liz Claiborne, Bill Blass, Carol Little, Perry Ellis, Armani, Ralph Lauren, Oleg Cassini, Yves Saint Laurent, Pierre Cardin, Emanuel Ungaro, Versace, Valentino, Christian Dior, Coco Chanel, Prada, Louis Jourdan, Burberry, London Fog, Brooks Brothers, Beverly Hills / Rodeo Drive designers, Portara, Prada, Norman Kamali, Cachet, etc.                                                    200,000.00

*I* - Costumes from films, many garments, priceless                                      25,000.00

*I* – Specialty clothing – personally designed, velvets, silks, wools, cashmeres, leathers, including specialty designed leather ensemble & knit & metal dress that received awards                                                                                            12,000.00

*I* -Shoes – huge collection over 40 years – boots, cowboy boots, high heels, sandals, casual, sports, moccasins, rain wear, ski boots, designer shoes, such as Gucci, Ferragamo, etc.                                                                                 20,000.00

All shoe products: cleaners, leather cleaners, suede cleaners, patent leather cleaners, polishes, wear protectants, water repellants, brushes, creams, etc.                300.00

*I* – Belts – many leather, specialty, metallic, beaded, lifetime collections               5,500.00

*I* – Evening bags, purses – variety, designer, lifetime collection, evening, leathers, jeweled, specialty bags from L.A. & NY, Europe, etc.                                16,500.00

Rare ancient coin from the 2nd Temple (wedding gift from Michael to Ruby)          2,000.00

Shoe racks (3)                                                                                                 125.00

Belt racks, holders (2) wooden                                                                            60.00

Night wear, robes, gowns, bed jackets, slippers, etc. (huge collection, some designer & from films)                                                                             4,500.00

*Under garments: all - bras, panties, corsets, bustiers, teddies, camisoles, garter belts, nylons, panty hose, many designer from photographic shoots, films, 45 year collection                                                                                          6,000.00

| | |
|---|---:|
| Holding/ storage case | 500.00 |
| Gold dipped (14 carat) holly necklace | 1,000.00 |
| Gold dipped (14 carat) parsley earrings | 450.00 |
| Maltese cross (from Malta) | 150.00 |
| Pink sea shell necklace & earrings set in 14 carat gold trim | 95.00 |
| *I* - Antique Cameo pin & earrings set (from mother) | 200.00 |
| Bead necklace with 100 small carved elephants inside (rare) | 200.00 |
| V shaped solid sterling silver necklace & bracelet set | 350.00 |
| Watches: Cartier, Gucci, Rodeo Drive, Rolex | 7,500.00 |
| Sterling silver & turquoise necklace & bracelet set (from mother) | 500.00 |
| Pearl necktie necklace (rare) | 2,000.00 |
| Three strand pearls (engagement gift to Ruby's mother from her father in 1947) | 1,500.00 |
| Ruby & diamond set of necklace, earrings & ring (Anastacia in case) | 4,500.00 |
| Pre-Columbian stone jade bead necklace | 3,000.00 |
| Pearl earrings & ring, also ring with 2 rubies | 400.00 |
| Ivory bracelets (anniversary gift) | 100.00 |
| Limoges ceramic angel necklace | 250.00 |
| Many rings – emerald, sterling silver, amber, aquamarine, star sapphire, ruby sapphire, onyx & silver, agate | 2,500.00 |
| *I* - Father's Masonic gold ring from the 1930's (18 carat gold) with Maltese cross & with Latin inscription "In Hoc Signo Vinces" | 2,500.00 |
| Crown from beauty contest 1970 | 200.00 |
| Custom magic necklace inscribed with "honi soit que mal y pensa" | 150.00 |
| Silver tray | 190.00 |
| Diamond tie tack of Ruby's son | 350.00 |
| Huge collection of costume jewelry from 45 year collection of rings, necklaces, earrings, hair jewelry & from films | 2,500.00 |

*I* - Glove collection: huge, over 45 years, leather, lace, wools, evening, etc.                    3,500.00

*\*I* - Hand knit & crocheted items, over 45 years, including shawls, sweaters, hats,

afghans, mittens, socks, specialty dress that was given design awards for originality

in fashion design, etc.                    7,000.00

*\*I* - CDs & cassettes, boxes that Ruby produced (irreplaceable, as Brandon &

Melissa also stole or discarded the master tapes that were in garage                    2,700.00

\*Cash for payroll for Security Company                    3,400.00

Additional cash on hand                    1,200.00

\*One Million Iraqi Dinar cash – valued to be considered at current exchange rate

*I* - Decorative tins (family heirlooms), of threads, needles, buttons, sewing

materials, etc.                    650.00

Vitamins, herbs, tinctures, prescription pills, powders, many specialty prescribed

to me (see additional list attached)                    3,750.00

*I* - Main family Bible with all records inscribed, births, deaths, marriages, etc.                    150.00

*I* - Other Bibles (inscribed), a Torah & a Siddur                    350.00

Many books, hardcovers, paperbacks, first editions, autographed, etc.                    10,000.00

Records of additional cash paid to Brandon & Melissa over 3 years                    [15,000.00]

Manicure set (Bloomingdales, NY), additional manicure sets, other manicure

scissors, nail files, electric nail manicure set, nail polishes, bases & top coats,

decorative jewels & stickers, gold & silver dusting powders                    1,150.00

*\*I* – Photographs: from Ruby's childhood, last photos of Ruby's mother before

she passed away, photos from professional shoots                    25,000.00

SAG / AFTRA ONE UNION residual checks (unknown value or how many)

Bank books, zipper bank bags from companies, deposit slips, account #s

All hair care brushes, combs, pics, bobby pins, clips, headbands, etc.                    450.00

*I* - Huge collection over 45 years of hair accessories, bows, designer clips, ties,

scrungies, designer hair jewelry, global collection                    3,500.00

Clothes steamers (2)                    125.00

Luggage (3) suitcases, smaller travel hand carry bags, rolling bags, shoulder

bags, etc.                                                                                          2,500.00

*I - Global collections of memorabilia & gifts: key chains, cups, clothing, posters,

(many valuable) but some chotskies (from events, conventions, shows, etc.)

Lifetime collection of memorabilia from major stage shows, concerts, in major

cities worldwide, such as A Man for all Seasons, Caberet, Evita, Phantom of the

Opera, Les Miserable, My One & Only, Sweet Bird of Youth, HMS Pinafore,

Man of LaMancha, Cats, Lion King, Aladdin, Fiddler on the Roof, The Beatles,

Rolling Stones, The Beach Boys, Queensryche, & many more                                            7,500.00

Angel collection, global, varied, special (some gold trimmed or gilded)                             5,000.00

*I - Coin collections, old U.S. Currency collections, foreign currency collections,

silver dollars, gold coins, ancient coins from the 2nd Temple in Israel (wedding gift)    7,500.00

I - Ferrari Formula One racing jacket (satin, not made anymore) & Ferrari pin                       275.00

*I - Huge pin collection, global, 45 years, jewels, silver, diamond, gold, platinum,

enamel, feather, beaded, gilded, etc.                                                               7,500.00

Pads & sanitary products supply                                                                      85.00

First aid products & kits, band aids, antiseptics, pain relieving ointments,

gauze, tape, ace bandages, etc.                                                                     175.00

Chrystal powder dish with sterling silver lid                                                       200.00

Sterling silver decorative note pad                                                                 600.00

Medical equipment: C-Pap machine, hoses, liners, masks, diabetes blood testing

equipment & strips, electric blood pressure machine, etc.                                           550.00

Ceramic vases, ceramic hand for rings, decorative crystals                                          175.00

I - Gifts to Michael from Bill & Hillary Clinton, tie & White House memorabilia                     500.00

Hangers                                                                                             250.00

Safety pins                                                                                          25.00

I - Manuscript for finished book

I – Collection of letters from relatives, mostly deceased

| | |
|---|---|
| Knitting & crochet hooks, basket | 200.00 |
| Yarns, many colors & styles, specialty yarns | 350.00 |
| *I* - All clothes in closet: designer labels, beaded gowns, coats, floor length wool cape, pants, suits, wedding dress, brides maids dresses & jackets, etc. | 25,000.00 |
| Shoes, boots, sandals, tennis shoes, heels | 800.00 |
| Suitcases (3) | 750.00 |
| Gun belt (leather) & accessories, handcuffs (peerless), pepper spray, flashlight, hand cuff keys, leather hand cuff holders (2), leather flashlight holder | 600.00 |
| *I* - CDs of film produced, including the master Director's cut | 200.00 |
| *I* - Memorabilia of son growing up in school, graduations photos, diplomas | |
| *I* - Business records | |
| *I* - Decorative vases, photos in frames, paintings | 350.00 |
| *I* - Hand chalk color drawings (Ruby from 1971) | |
| *I* – Handmade wooden letter writing box (Ruby's from 1975) | |
| *I* - Leather briefcases (2) with contents of business records | 250.00 |
| 1 – Memorabilia & heirlooms from deceased parents of Ruby | |
| Area rug – expensive, pink floral | 1,250.00 |
| Floral arrangements | 125.00 |
| *I* - Stamp collection – lifetime, many first edition plate blocks from 1970s & 80s | 1,500.00 |
| Coin collections | 500.00 |
| Plastic garment bags (large, zippered) | 150.00 |
| Alaska hunting knife, beige bone handle, medium, curved blade | 75.00 |
| *I* - Magazine "PETITE" that Ruby was Editor & one of the founders, original issues & copies | |
| *I* - Ruby's stamp collection (global) | 5,000.00 |

## GARAGE

*I* - Photos - lifetime collections, life's work of Ruby's professional photos

*I* - Headshots, resumes, bios, magazine tear sheets from work, video tapes, etc.                    2,500.00

*I* - Master tapes from TV shows, films, some Ruby had produced                    5,000.00

*I* - Family photos over lifetime, including antique photos from the 1800 & early 1900s

*I* - Family heirlooms & memorabilia from parents & grandparents

*I* - Ruby's father's Bible

Ski clothes: boots, mittens, down jackets, jump suit, ski pants, goggles, hats, face warmers, knit shirts, thermal under wear, etc.                    1,200.00

*I* - memorabilia from son, school years of memories, photos, diplomas, awards, Trophies, baby shoes, etc.                    350.00

GI Joe collection from the 1980's                    500.00

*I* - CDs & cassettes from 2 record albums produced by Ruby, product & master tapes                    3,500.00

*I* – Anti-theft device, over 100 boxes of product                    15,000.00

*I* - Master tapes of other original compositions & recordings                    1,000.00

Video collection – huge                    1,500.00

*I* - Books: extensive collection of first editions, signed by authors to Ruby from 25 year membership in the largest literary book club in the country                    12,000.00

*I* - Clothes: more film wardrobe, clothes from photo shoots in NY & worldwide handmade wedding dress with hand knit lace, leather coats, fur coat (rabbit), deer skins, evening gowns, velvets, satins, silk blouses & dresses, wools, etc.                    10,000.00

Towels, tablecloths, extra chair, leaf for table                    800.00

Antique mirror with dresser                    700.00

Lawn chairs (4) director chairs (3)                    260.00

Bicycles (2) 10 speeds                    800.00

Tent, 4 room                    550.00

| | |
|---|---|
| Ruby's son's Tallis, yarmulke & silver cup form his Bar Mitzvah, in blue velvet zipper bag | 350.00 |
| *I* - All text books & writings from work on second bachelor's degree in Criminal Justice & Masters/Doctorate thesis & degrees for Ruby | |
| Christmas decorations & lights | 250.00 |
| Fishing rods & fishing gear | 500.00 |
| Binoculars | 65.00 |
| Moving blankets | 200.00 |
| Shelving | 350.00 |
| Table saw | 1,000.00 |
| Auto accessories, garment rods, plugs, holders, sunshades, blankets, charging cables, racks, bike racks, etc. | 1,250.00 |
| Power inverters (2) | 300.00 |
| Umbrellas (10+) | 350.00 |
| vertebra of a velasoraptor (official university dig) | 2,000.00 |
| Cross section of a T-Rex (official university dig) | 2,500.00 |
| Meteor | 1,500.00 |
| Decorator an gift storage boxes | 650.00 |
| Portable auto/home refrigerators (2) | 280.00 |
| Many storage baskets | 500.00 |
| *I* - Degrees, Diplomas, certificates of achievements, martial arts certificates, etc. | 250.00 |
| Martial Arts Gis and all belts | 500.00 |

| | |
|---|---:|
| 5 crystal platters | 750.00 |
| *7 vases, crystal, porcelain, ceramic, sterling silver | 3,500.00 |
| *I - 6 photo albums, decorative, special, had photos in them | 1,200.00 |
| Apron & Shabbat bread cloth & sterling silver cutting knife | 250.00 |
| Green jade lions (2) | 200.00 |
| *Framed color etching of Shakespeare's cottage, Stratford on Avon | 2,250.00 |
| International film director's award | 250.00 |
| Curtains & rods | 125.00 |
| Flashlights, batteries, measuring tapes, | 150.00 |
| Warmer thermos serving pots, commercial (4) | 160.00 |
| I - Car thermos mugs (12, including collector's from films) | 240.00 |
| Electric can opener | 25.00 |
| Electric coffee makers (2), electric tea brewer, coffee carafes for drip system (2), | |
| filters, coffee | 275.00 |
| Canisters, cutting boards | 175.00 |
| Pens, pencils, pencil sharpeners, paper clips, copy paper, all sizes envelopes | |
| & other standard office supplies | 400.00 |
| All kitchen dish towels, baking cloths, pot holders, etc. | 300.00 |
| I – Collection of aprons, Celebrity Waiter's Children's Diabetes Charity | |
| luncheons, films & celebrity events | 1,500.00 |
| Baking pans, assorted sizes & materials | 300.00 |
| Pots & pans sets (2) | 300.00 |
| Cast iron stove top grill | 125.00 |
| Teak salad serving bowl set with serving tools | 150.00 |
| Paper towel holders (2) wooden | 65.00 |
| Coffee grinder | 45.00 |
| Espresso Machine | 125.00 |
| I - Herb & spices from Europe, not available in the U.S. | 350.00 |

**DINING ROOM**

| | |
|---|---|
| Refrigerator (2nd, 4 foot) | 125.00 |
| Wall plate set & hangers – Lafayette Revolutionary War (see other list) | 500.00 |
| Gone With the Wind Bradford Exchange collectors plates | 1,250.00 |
| *Sterling silverware set in wooden chest (wedding gift) | 2,000.00 |
| Wooden tea chest with tea | 125.00 |
| Ceramic bowl & chip platter set | 65.00 |
| Ceramic dip & chip set (gift from ruby's son) | 85.00 |
| Framed family photos | 300.00 |
| Silver platter & serving dishes | 750.00 |
| Collections of model houses & accessories | 350.00 |
| *I – Sterling silver antique family heirloom coffee & tea server set | 12,000.00 |
| Sterling silver candlestick holders (2 pair) | 1,200.00 |
| Wicker picnic basket, large, with all dishes | 250.00 |
| Specialty tea (gifts from Ruby's son) | 250.00 |
| Ice chests & coolers (5) | 300.00 |
| Portable travel refrigerators & coolers (for auto &/or hotels) | 400.00 |
| All foreign travel energy convertors | 800.00 |
| Pillows, decorative | 200.00 |
| I – Hand crafted wooden candle holder from son and candle) | 50.00 |
| *I - Negatives, prints of exclusive photographs of Modigliani original painting (valued at $7million), photographed by Michael for collection & sale by Meshulam Riklis (billionaire) & of ebony & gold chest that Napoleon gave to Josephine | 6,000.00 |
| I - Mail: all mail to us, including that which we mailed to ourselves, memorabilia from worldwide travels | 5,000.00 |
| I - Business records | |
| I - Legal file boxes entrusted to house sitter's care by family attorney | |
| Seattle World's Fair collector's plate & hanger | 40.00 |

## GREAT ROOM (DOUBLE STORY)

**Three Fur coats:**

| | |
|---|---|
| *Full length black mink & fox with initials "RH" | 12,000.00 |
| *Silver mink & fox jacket | 3,500.00 |
| *Fur cape, silver | 2,500.00 |
| * Rabbit Fur coat | 800.00 |
| *Leather and mink fur jacket | 1,600.00 |
| *Comic book collections - valuable, many $25.00 to $50.00 in 1980s, each in mint condition with cardboard & plastic | 8,000.00 |
| Baseball card collection, valuable, primarily from the 1980's | 1,500.00 |
| *I - All coats & jackets in closet, many designer labels, wools, down, leathers | 10,000.00 |
| All rainwear & snow wear– coats, hats, umbrellas, boots | 600.00 |
| Umbrella folding seat | 125.00 |
| Cards, Christmas & other holidays | 250.00 |
| *I - Holiday decorations – lifetime collections, all holidays | 2,500.00 |
| Pillows, decorative & curtains | 750.00 |
| Wrapping paper, ribbons, gift bags, name tags, tissue paper, gift boxes, etc. | 200.00 |
| Wooden tea boxes | 150.00 |
| Hats, designer, in boxes | 1,000.00 |
| Sleeping bags with air mattresses (2 each) | 800.00 |
| Exercise mats (2) | 50.00 |
| Fireplace matches (long) | 5.00 |
| *I - Luggage, Tommy Bahamas designer, full of clothes, jewelry, cosmetics, under garments, hair accessories, nylons, socks, shoes, shoulder pads, etc. | 10,000.00 |
| Hartmann Luggage set of 3 cases | 2,500.00 |
| *I - Garment travel bag full of clothes | 5,000.00 |
| *I - Medium suitcase full of sweaters, vitamins, prescription pills, gifts, etc. | 3,000.00 |
| I – Many files & business file boxes full of records, legal matters, etc. | |
| Electronic keyboard & external speaker | 1,250.00 |

## HALF BATHROOM OFF OFF GREAT ROOM

| | |
|---|---:|
| Wicker wall cabinet, green | 85.00 |
| Rugs, towels, washcloths | 120.00 |
| Book & magazine racks & baskets | 100.00 |
| *I* - Magazines, books & 3 **inscribed family bibles** | 500.00 |
| Nail polishes, files, soaps | 250.00 |
| *I* - Ceramic decorative dishes from family heirlooms, vases, flowers | 150.00 |
| Lotions, creams, sunscreen, antiseptics | 100.00 |
| Toilet brush & toilet cleaners & blue cleaning tablets | 30.00 |

## OFFICE / STORAGE / WARDROBE

| | |
|---|---:|
| *I* – Cloths - huge collection, mostly designer labels (Bill Blass, Oleg Cassini, Diane Von Furstenberg, Ann Klein, Liz Claiborne, Perry Ellis, Yves Saint Laurent, Ralph Lauren, etc.), suits, dresses, gowns, wardrobes from films, TV commercials & print ad assignments over years, coats, sweaters, shirts, etc. | 150,000.00 |
| Shoes, boots, sandals, etc. from same as above | 7,000.00 |
| Costumes from many films | 10,000.00 |
| *I* - Scarves – massive collection from above as well as global collection, many designers, such as Hermes, silks, wools, etc. | 8,000.00 |
| *I* - Jewelry – | |
| *Leather & mink jacket, brown tones, vertical stripped | 2,000.00 |
| Leather coats, fur collars | 1,000.00 |
| *Sterling Silver open hole Gemeinhardt flute | 2,500.00 |
| Bookcases (4) wooden | 450.00 |
| Tables – (2) wooden | 250.00 |
| Cabinet with drawers, wooden | 300.00 |

Additional List of Stolen / Missing / Destroyed Items at 800 Calle Divina NE
From Michael Jacobs


**LIST BY ROOM / LOCATION**


<u>Front Office</u>

| | |
|---|---|
| Vintage Book Collection | $7,500. |
| Vintage Spielberg group photograp, appraised value | 10,000. |
| Antique Polynesian wood carving | 1,000. |
| 4,000 year old Hebron (Israel) dagger | 5,000. |
| Various antiques | 10,000. |
| Business Reference books | 2,000. |
| Book Collection | 1,000. |
| Fireproof Box with precious paperwork | 800. |
| British Birth Certificate | |
| Canadian Citizenship papers | |
| U.S. Military Personnel Records | |


<u>Dining Room</u>

| | |
|---|---|
| New York City skyline in silver etching 5' x4' | 1,000. |
| Old family silver | 5,000. |
| Vintage Revolutionary War plates | 1,000. |
| 3 large oil paintings | 5,000. |
| 2 large studio projectio   n screens | 1,500. |
| Antiques | 5,000. |
| Crystal glasses | 1,200. |


<u>Hallway / Stairs</u>

| | |
|---|---|
| Vintage framed first Star Wars Poster (not publicized nor sold) | 2,500. |
| Various unframed film and event posters | 5,000. |
| Christopher Reeve vintage framed Giclee oil color print | 10,000. |
| Bob Hope vintage framed sepia tinted Silver Gelatin print | 10,000. |
| Barbra Streisand vintage framed color Giclee oil print of MGM Grand Millennium Concert | 12,000. |
| Samaritan Ancient Hebrew text framed Messuzah | 1,000. |


<u>Living Room</u>

| | |
|---|---|
| Numbered Limoges large Statue of Liberty | 5,000. |
| Framed Telephone History Poster | 500. |
| Wailing Wall Photograph, mounted, 24" x 36" | 10,000. |
| Antique cabinet | 500. |
| 35" Sony Triniton TV | 900. |
| Antiques (lamps, vases, clock, end tables, cabinet, cups, European memorbilia) | 5,000. |
| Le Sacre du Printemps (The Rite of Spring), framed oil painting | 2,500. |
| Various framed  Posters | 2,000. |

## Garage

| | |
|---|---|
| Bridgestone bicycle | $ 400. |
| Trek bicycle | 300. |
| Table top saw | 200. |
| Rolling Tool cabinet & all tools | 6,000. |
| Antique woodworking family heirlooms | 800. |
| Vintage Magazine collection, U.S., European, & global | 10,000. |
| Land Rover bike rack | 500. |
| SUV top car carrier, clothes rack, accessories | 750. |
| 3 Ladders | 300. |
| Storgae units | 200. |
| Newspaper collection of Michael's published work, globally (irreplaceable) | |

## Upstairs Bedroom (Blue)

| | |
|---|---|
| 19" Sony combo Video / DVD player and TV | 200. |
| Antique Lionel 1950s Large Trainset, track & accessories | 20,000. |
| Original ET Movie merchandise in original packing (new) | 20,000. |
| Raider Football negatives, 1970-71, 500: Direct loss | $1,000,000. |
| Career negatives, 1000: Direct loss | $2,000,000. |
| Military clothing | 500. |
| Vintage Film Posters | 1,000. |
| Vintage WWII Posters | 3,000. |
| Antique Newspaper collection, global | 5,000. |

## Photography Equipment & Gear

| | |
|---|---|
| Hasselblad 500EL | 2,500. |
| Hasselblad 500C | 1,000. |
| 250mm lens | 1,500. |
| 180mm lens | 1,000. |
| 80mm lens | 750. |
| 55mm lens | 1,200. |
| Polaroid Back | 500. |
| Lens Shade | 300. |
| 4 Film Backs | 600. |
| Prism | 1,000. |
| Case | 350. |
| Accessories | 1,000. |
| Canon LR2 Digital Video Camera | 2,000. |
| JVC Digital Video Camera | 600. |
| Nikon FM2 | 500. |
| Nikon F4 | 1,200. |
| Nikon F100 | 1,000. |
| Nikon D2 | 1,500. |
| 80-200mm lens | 1,200. |
| 180mm lens | 900. |
| 105mm lens | 600. |
| 35-70mm lens | 1,500. |
| 24mm lens | 600. |
| 20-35mm lens | 1,500. |
| 17mm lens | 1,000. |
| 35mm lens | 500. |
| 35mm 1.4 lens | 600. |

VERIFIED AFFIDAVIT OF FACT BY BRANDON CLARK

1. I am familiar with the proceedings in this case.

2. I make this statement based on personal knowledge of the facts set forth herein and in support of Defendant Mr. Jacobs' Motion to set Aside Plaintiff's Default Judgment

3. I, affiant Brandon Clark, a resident in the State of New Mexico and do state under penalties for perjury that the following sworn statement and all representations herein is the entire truth, and therefore avers the following:

4. I have been staying at the home of Michael Jacobs since October 2, 2013 and as house sitter during the time that Mr. Jacobs was not at home, nor in the State of New Mexico, which includes the entire time from October 3, 2013 to February 3, 2014.

5. I have been responsible to collect all of the Jacobs' mail at their home and at their Post Office Box.   During the last several months and since I have been residing at the Jacobs' home and also getting the mail at the Post Office Box in Albuquerque, New Mexico, there was no mail, nor any Certified Mail Certificate addressed for Mr. Jacobs from the Law firm of Nemecek & Cole in California, nor did anyone come to the door for physical service.

*FURTHER, AFFIANT SAYETH NAUGHT.*

Brandon Clark

State of New Mexico

County of Bernalillo

Signed and sworn (or affirmed) before me on _____ by

Brandon Clark.

Signature of notarial officer

**Exhibit 11**

THU-57904 1084-1 309E 19-10585
Gerald R Velarde
2531 Wyoming Blvd NE
Albuquerque, NM 87112-1027

**OFFICIAL BUSINESS**
UNITED STATES BANKRUPTCY COURT
PENALTY FOR PRIVATE USE, $300
CONTAINS NOTICE of a PROCEEDING
in the
UNITED STATES BANKRUPTCY COURT

001247  1247 1 AV 0.380  87113  6 9  8766-1-1247
Amanda Carole
800 Calle Davina
Albuquerque, NM 87113-1281

**FIRST-CLASS MAIL**

PRESORTED
FIRST-CLASS MAIL
POSTAGE & FEES PAID
UNITED STATES COURTS
PERMIT NO. G-18

**Exhibit**
**12**

# Business Market Rate Savings

Account number: ████████████ ■ April 1, 2017 - April 30, 2017 ■ Page 1 of 4





008976 1 AV 0.373  372909

WILLIAM M JONES
DBA FIRE AND ICE AUTO REPAIR
800 CALLE DIVINA NE
ALBUQUERQUE NM 87113-1281

## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-CALL-WELLS** (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (585)
P.O. Box 6995
Portland, OR 97228-6995

## Your Business and Wells Fargo

Visit wellsfargoworks.com to explore videos, articles, infographics, interactive tools, and other resources on the topics of business growth, credit, cash flow management, business planning, technology, marketing, and more.

### Activity summary

| | |
|---|---|
| Beginning balance on 4/1 | -$19.32 |
| Deposits/Credits | 19.32 |
| Withdrawals/Debits | - 0.00 |
| **Closing balance on 4/3** | **$0.00** |
| Average ledger balance this period | -$12.88 |

Account number: ████████████

**WILLIAM M JONES**
**DBA FIRE AND ICE AUTO REPAIR**

*New Mexico account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN): 107002192

For Wire Transfers use
Routing Number (RTN): 121000248

### Interest summary

| | |
|---|---|
| Interest paid this statement | $0.00 |
| Average collected balance | $0.00 |
| Annual percentage yield earned | 0.00% |
| Interest earned this statement period | $0.00 |
| Interest paid this year | $0.00 |



**Exhibit**
**13**

DCRD21UTDV 008976  NNNNNNNNNN NNN 001 002  585 041869    2046644 0.2



ruby handler jacobs

Fotos zum Thema ruby handler jacobs

Imago images zu entdecken.

Insgesamt 7 Stockfotos & Bilder zum Thema ruby handler jacobs stehen zum Lizenzieren zur Verfügung.

starten Sie eine neue Suche, um noch mehr Fotos bei

Ergebnisse filtern

alle Bilder | Bilddatenbank | Editorial | Creative | Events | Kollektionen | imago sport | Vorschau | imago stock&people

PLAINTIFF
14

**Translation:** a total of 7 stock photos and images on the topic of Ruby Handler Jacobs are available <mark>for licensing.</mark> Or start a new search to discover even more photos at imago images.

CHANGE OF ADDRESS SECURITY DIVISION
COMPUTERIZED FORWARDING SYSTEM
UNITED STATES POSTAL SERVICE
1441 E BUCKEYE RD
PHOENIX AZ 85034-4128

NOV 26, 2017

**Dear CLARK FAMILY,**

The Postal Service has received a
Change-of-Address order asking us to
forward mail *from* the following address
for the family named below:

**THE CLARK FAMILY**

1043312          01 AB 0.400  **AUTO  T9 0 6783 87113-128100   -C01-P43355-I 2  6 89A


CURRENT RESIDENT OR
THE CLARK FAMILY
800 CALLE DIVINA NE
ALBUQUERQUE NM 87113-1281


*The purpose of this letter is to confirm that this request to forward mail is correct.*

| NO ACTION required if: | ACTION required if: |
|---|---|
| • *The information listed above is correct.* | • *Anything is incorrect with the Change-of-Address order shown above, or if the family listed above did not ask the Postal Service to forward their mail, please call* ***1-800-ASK-USPS** (1-800-275-8777).* |
| • *The Change-of-Address order is for someone who has already moved from this address.* | |

It is important that we work together to ensure proper mail delivery. Please notify your
correspondents of your new address. If you are the current resident, and you continue to receive
mail for the family above, please return the mail to your Post Office.

The United States Postal Service values you as a customer and we appreciate the opportunity to serve you.

Si usted no habla Ingles o no comprende esta carta, favor de llevar esta carta a su oficina local
de correo para ayuda.

(If you do not speak English or you do not understand this letter, please take it with you to your
local post office for assistance.)

*As required by law, the Postal Service does not provide customer names or addresses to third parties.*

**Exhibit
15**

# Rental Purchase Agreement



**DATE:** 4/3/2017

**AGREEMENT #** 4920000827

**LESSOR:** BMH Belen # 492
520 S MAIN ST
BELEN    , NM 87002
(505)861-3681

**RENTER:** William Jones

800 CALLE DIVINA NE
Albuquerque, NM  87113

**HOME:** (505)859-5030

## TERMS OF AGREEMENT

As used in this agreement "You" and "Your" refers to the person or persons signing this agreement as Renter.  "We" and "Our" refers to Lessor/ Owner.  "Lease" refers to this Rental Purchase Agreement including all addendums.

### RENTAL PURCHASE DISCLOSURES

☐ **1. RENTAL TERM:** WEEKLY    Rental Payments are due at the beginning of each term that you choose to lease the property.  You are not obligated to renew this agreement or purchase this property. There are no refunds if you choose to return the property before the end of the term.

☐ **2. DESCRIPTION OF RENTED PROPERTY AND RENTAL RATES:**

| Item # | Item: | Brand | Model # | Serial # | Condition |
|---|---|---|---|---|---|
| 1902805305 | QUEEN MATT | | 7611QPT | | Pre-Leased |
| 4940000508 | FULL MATTRESS & I | | 953956-3030 | 12 | Pre-Leased |
| 4920000397 | TWIN BEDDING | SERTA | 273299-5010 | 501011 | Pre-Leased |
| 4920000400 | TWIN BEDDING | | 952166-3010 | 301011 | New |

☐ **3. RENTAL RATES, CHARGES AND FEES:**

| | WEEKLY RATE | MONTHLY RATE | |
|---|---|---|---|
| ONE RENTAL PAYMENT | $24.99 | $99.96 | **TOTAL DAMAGE WAIVER FEE** $162.50 |
| STATE AND/OR LOCAL TAXES | $2.29 | $9.14 | |
| DAMAGE WAIVER (Optional) | $2.50 | $10.00 | **IN HOME COLLECTION FEE** $10.00 |
| TOTAL-REGULAR PAYMENT | $29.78 | $119.10 | |
| *WITH BUDDY'S PLATINUM PLUS* | $33.02 | $133.13 | **RETURN CHECK CHARGE** $25.00 |

**TO RENEW THIS AGREEMENT, YOUR NEXT RENTAL PAYMENT MUST BE MADE BY:** 4/10/2017

☐ **4. TOTAL PAYMENT DUE AT BEGINNING OF RENTAL:**

| | |
|---|---|
| INITIAL RENTAL PAYMENT | $24.99 |
| DAMAGE WAIVER (Optional) | $2.52 |
| STATE AND/OR LOCAL TAXES | $3.14 |
| ADDITIONAL ONE-TIME FEES | $10.00 |
| TOTAL DUE AT BEGINNING OF RENTAL (Initial Payment) | $40.65 |
| *WITH BUDDY'S PLATINUM PLUS* | $43.92 |

Customer Initials

☐ **5. TOTAL COST:** If you choose to rent to own you must renew this lease for the following number of months or weeks. The Total Cost includes the initial rental payment but does not include other charges, such as late payment fees or charges for other optional products or services.

65.00    weekly payments @    $24.99  for a total cost of  $1,624.35

15.00    monthly payments @    $99.96  for a total cost of  $1,499.40

You do not acquire ownership rights or equity unless you renew this lease and make all the required rental payments for all the weeks/months shown herein. You may also acquire ownership through the Same As Cash opportunity and Early Purchase Option.

☐ **6. CASH AND SAME AS CASH PRICE IS:**    $899.99    .  Your opportunity to purchase the rental property for the Same As Cash price expires on  10/2/2017    .  You may exercise this opportunity only by paying  $899.99    in rental payments on or before  10/2/2017    .  Only rental payments are applied to the Same As Cash price.  Taxes, optional damage waiver and other charges or fees do not reduce the Same As Cash balance.  You are responsible for making the rental payments before the expiration date. Your opportunity to purchase the property for the Same As Cash price is only valid through the expiration date, after which you may still exercise the Early Purchase Option available in this agreement.

☐ **7. EARLY PURCHASE OPTION:** If you have complied with this agreement, you can buy the property before your final payment for less than total cost. The Early Purchase price will be 75% of the difference between the Total Cost and Total Amount of Rental payments you have already paid (excluding taxes, optional damage waiver, or a fees), plus sales tax.

**Exhibit 16**

☐ **8. RISK OF LOSS:** You are responsible for the fair market value of the property if, and as of the...

 **UNITED STATES POSTAL SERVICE** ®

**★ Official ★ Change of Address Confirmation Letter ★**

## VERIFICATION REQUIRED

Mail will be forwarded for all persons at the old address with the following last name:

**SWAN**

Your mail will be forwarded to your NEW address, as you requested, on: **May 24, 2017**

### YOUR OLD ADDRESS

**SWAN
4 MOUNTAIN VIEW RD
ARTESIA NM 88210-9259**

### YOUR NEW ADDRESS

**000008243 02 AB 0.403   T:0028**

**SWAN
800 CALLE DIVINA NE
ALBUQUERQUE NM 87113-1281**

If the information contained on this page is incorrect, or you have not received mail at your new address for **10 Postal business days or more**, please call **1-800-ASK-USPS** (1-800-275-8777).

If you need to view or cancel this Change-of-Address Order, change the date to start forwarding your mail or change the move type from Family to Individual, visit **managemymove.usps.com** and enter the Confirmation Code:   **1714 6175 5000 1660**

Visit managemymove.usps.com to add your email address and receive email reminders of mail forwarding expiration dates.

### NOTIFY CORRESPONDENTS WHO SEND YOU MAIL

Mail forwarding may be available for up to 12 months and covers only certain classes of mail.

To ensure delivery of all your mail and to avoid forwarding delays, you should notify everyone who sends you mail.

### MAIL FORWARDING EXPIRATION DATES

| | |
|---|---|
| First Class Mail, Priority & Express.... | May 24, 2018 |
| Newspapers, Magazines.............. | Jul 23, 2017 |
| Packages¹................................ | May 24, 2018 |
| Catalogs .................................. | Not Forwarded² |
| Standard Mail ........................... | Not Forwarded² |

1. Some restrictions apply  2. Unless requested by mailer

## IMPORTANT MESSAGES FROM THE U.S. POSTAL SERVICE REGARDING YOUR MAIL FORWARDING REQUEST

Yellow stickers with your new address are placed on mail forwarded by the U.S. Postal Service. To receive your mail faster, notify the sender of your new address.

Please retain this Official Change of Address Confirmation page for your records as local agencies and/or resources may require it for proof of your move.

### WHY THE YELLOW LABELS?

Yellow labels indicate the correspondent doesn't know your new address.

If you receive mail with a yellow label attached, notify the sender of your new address.



**Exhibit 17**

SEATTLE WA 980

15 JUN 2018 PM 4 L

Reece Kexel
816 Calle Divine N.E.
Albuquerque, New Mexico
87113-1300

Bob & Linda Strock
23706-101st Ave West
Edmonds, WA 98020-5759

87113-128115

**Exhibit
18**



**Exhibit 19**

**ENTRANCE TO PLAINTIFF JACOBS' PRIVATE OFFICE ON THE PROPERTY**



Exhibit
20



February 15, 2008
Appraisal Addendum: Clarification on Methods of Valuation

Re:    Appraisal for Michael J. Jacobs & Ruby Handler Jacobs
       C/o Rio Grande Studios
       6608 Gulton Court NE
       Albuquerque, NM  87109
       June 1, 2007

      This Appraisal was made with the understanding that the Methods of Valuation considered, the Cost Approach, Income Approach, and Market Approach, are not exclusive to one another, and that employing one approach does not negate use of another. In the case of Michael Jacob's massive image archive, the subject of the June 1, 2007 Appraisal, these approaches may in fact be considered simultaneously, resulting in a total valuation opinion, including the present value and the value of potential income, of $2,750,687,700.00.

_____
Caroline Seigel,
Accredited Member, American Society of Appraisers
Signed in Santa Fe, NM this 15th day of February 2008



**Exhibit 21**

## STATE OF NEW MEXICO
## OFFICE OF THE ATTORNEY GENERAL



### HECTOR H. BALDERAS
### ATTORNEY GENERAL

# Electronic Complaint Submission

## Submission Detail

| | |
|---|---|
| **ECS Reference Number** | NMOAG-ECS-20201021-ceff |
| **Final Submit Date** | 10/21/2020 10:06:17 PM |

**Disclosure of your complaint:** This complaint is a public record, thus available under provisions of the NM Inspection of Public Records Act.

**Disclosure to other entities:** This complaint, its content, and other information may be disclosed to other law enforcement and regulatory agencies.

☑ I understand this complaint and any submitted documents are public record and may be shared with other law enforcement and regulatory agencies.

**DECLARATION:** By submitting this form, I attest that the information in this complaint is true and accurate to the best of my knowledge. I further understand that by submitting this form I may be called to testify as a witness in this matter.

☑ I understand declaration statement.

The New Mexico Office of the Attorney General cannot give legal advice regarding this complaint and will not act as your personal attorney. If you have questions regarding your rights please contact a private attorney.

Submission of this complaint is not confirmation that an investigation will be initiated.

**Exhibit 22**

## Comp a nt aga nst

### Mr. Brandon DeWayne Clark

Person

**Address**

**Contact information**

DOB: 07/28/1976 SSAN# ▮▮▮▮ 1745 NM Dr ver's  cense # 51293576 (we have been  nformed that th s was not renewed) Last known veh c e p ate: NM WLO962

## Other Party

### Mrs Melissa M. Carroll

Person

**Address**

**Contact information**

DOB: 09/01/1979 SSAN: ▮▮▮▮-9092 NM Dr ver's  cense: 110425465 (We have been  nformed that th s was not renewed) Pr or name to marr ed name: Zaw stosk Husband: W   am "B  y" Carro  Daughter: Samantha C ark (father  s Wes ey M. C ark 9704 Snowhe ghts B vd NE, ABQ 87112 Mother: Ruth Ch oda a/k/a Ruth He dreth 428 Sea Spray Dr.. Bu head C ty, AZ 86442

## Other Party

### Albuquerque Police Department

Pub c Body (Government Ent ty)

**Address**

**Contact information**

P ease see attached packet

**Additional Information**

As of November 26, 2017, Brandon Clark & Melissa Carroll gave change of address notices to Phoenix, AZ. (included in this evidence). However, as per February 20, 2018, Mr. Clark was in Albuquerque, NM for a deposition. In that deposition, he stated that he was now living in Denver, CO.

Thus Brandon Clark & Melissa Carroll have apparently fled the state of NM with millions of dollars of stolen goods, including 3 of my firearms. Brandon Clark should be considered armed & dangerous.

The other accomplices, primarily William Jones and Candie Swan very well could still be in the state of NM.

I do not know who has any of my guns or these people's access to other weapons. There is a hose outside in the front of my house, which is randomly disconnected as a form of letting me know "they" are still here and harass me. **I am in constant fear of my life from this gang.**

Since I prepared this report with the evidence, yet another person, Jeremy Stone, was also illegally living in my home & using our address as his mailing address. (evidence included).

There was much evidence that all of these persons were involved in the gross theft of our personal belongings. **It is my belief that there could be a possibility of recovering some of the stolen property,** if acted upon promptly.

I am also reporting computer crimes. I believe it would be Brandon Clark and / or Melissa Carroll who have tampered with personal Facebook page and my company Facebook page and other personal data. They have been illegally deleted & removed.

**IT IS A CRIME TO:**
*Knowingly accessing, and without permission altering, damaging, deleting, destroying, or otherwise using, any data, computer, computer system, or computer network, either to devise or execute any scheme or artifice to defraud, deceive, or extort, or to wrongfully control or obtain money, property, or data.*

Also violates the Electronic Communications Privacy Act (ECPA) and the Stored Communications Act (SCA).

There may be more unknown persons involved in the gross theft and intent to harm, harass and to kill than are listed in this report, yet to be identified.

A copy of Brandon Clark"s Driver's License in included. The last known cell phone numbers & other identifying information of some of the perpetrators are:

| | | | |
|---|---|---|---|
| Brandon Clark | (505) 307-9763 | SS# ▇-1745 | NM Dr. Lic. # 512932576 |
| Melissa Carroll | (505) 463-3588 | SS# ▇-9092 | |
| William Jones | (505) 859-5030 | SS# ▇-7608 | NM Dr. Lic. # 504224449 |
| Candie Swan | (575) 703-8386 | | |

**Exhibit
23**

**Additional Information**

As of November 26, 2017, Brandon Clark & Melissa Carroll gave change of address notices to Phoenix, AZ. (included in this evidence)  However, as per February 20, 2018, Mr. Clark was in Albuquerque for a deposition.  In that deposition, he stated that he was now living in Denver, CO.  The attorney representing our company in a civil case, gave me this information and thus would have the current contact information for Brandon Clark. This attorney's name is Nathan Mann of Gallagher, Casados & Mann, P.C., 4101 Indian School Rd.. NE, Suite 200N, Albuquerque, NM 87110; phone number (505) 243-7848.

Thus it is my understanding that Brandon Clark, and most likely Melissa Carroll, have therefore fled the state of NM with millions of dollars of stolen goods, including my 3 firearms.  Brandon Clark should be considered **armed and dangerous**.

Also, included herein, is more evidence that yet another person, Jeremy Stone, was illegally living in our home & using our address as his mailing address. (evidence included) *Andrea Texel & son, Reece*

There may be more unknown persons involved in this gross theft and intent to kill that are listed in this report, yet to be identified.

A copy of Brandon Clark's NM Driver's License in included.  His previous cell phone number was (505) 307-9763 and Melissa Carroll's last know phone number had been (505) 463-3588.